FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### [Alexandria Division]

|  |  |
|---|---|
| TIRE ENGINEERING AND DISTRIBUTION, LLC, a Florida Limited Liability Corporation d/b/a Alpha Tyre Systems and/or Alpha Mining Systems; and JORDAN FISHMAN, an individual | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| AL DOBOWI LTD., a foreign corporation; AL DOBOWI TYRE CO. LLC, a foreign limited liability company | )<br>)<br>)<br>) |
| Defendant. | )<br>)<br>)<br>) |

Civil Action No. 1:09 CV 1217
TSE/IDD

COMPLAINT

DEMAND FOR JURY TRIAL

Tire Engineering and Distribution, LLC, which does business as Alpha Tyre Systems or Alpha Mining Systems ("Alpha"), designs, develops and distributes highly specialized tires for underground mining vehicles.  All of Alpha's underground mining tires were designed and developed by the company's founder and Chief Executive Officer, Jordan Fishman ("Fishman").  Alpha was a leader in the underground mining tire market because its products were the best in the world, and were based on unique propriety designs developed by Fishman.  Beginning in 2005, however, Defendant Al Dobowi, Ltd. and Al Dobowi Tyre Company, LLC (together, "Al Dobowi"), a Dubai-based, international tire distributor, conspired with Shandong LingLong Rubber Company, Ltd. ("LingLong"), a China-based tire manufacturer, and a former Alpha employee to steal trade secrets and other proprietary and confidential business information from

Alpha and Fishman (together, "Plaintiffs"). Al Dobowi used this information to manufacture and distribute Alpha's highly specialized underground mining tires, strip Alpha of its competitive advantage in the market and steal Alpha's customers. As a result of this conspiracy and Al Dobowi's actions, Plaintiffs were financially devastated. Accordingly, Plaintiffs seek compensatory and exemplary damages from Al Dobowi.

## I.   SUMMARY OF THE ACTION

1.      Alpha designs, develops and sells underground mining tires. All of Alpha's underground mining tires were designed and developed by the company's founder and Chief Executive Officer, Jordan Fishman, who has nearly fifty years of experience in the industrial tire industry.

2.      Prior to 2005, Alpha was the only company in the world that produced tires with the highly specialized features of its product line based on Fishman's proprietary designs. For example, Alpha's tires came in unique sizes, had novel tread patterns, novel ply ratings, a rimgard, and a design referred to as OUTSIDEWALL. The tires also had distinctive markings and names created by Fishman, including *Mine Mauler*, *M.M*, *L-6T*, *L-6T+*, *EDT* and $\triangle$ *Recap*. Because Alpha's tires were one-of-a-kind, Plaintiffs took extensive precautions to safeguard their proprietary designs and markings, Alpha's customer lists, pricing information, production schedules, and other proprietary and confidential trade secrets (collectively, "trade secrets"). Moreover, Fishman obtained copyrights for the tire designs, a trademark for *Mine Mauler*, and had a patent pending for the OUTSIDEWALL design.

3.      In or about 1997, Fishman hired Sam Vance ("Vance") as Alpha's marketing manager to sell Alpha's underground mining tires. Fishman trusted Vance because, at that time,

2

he had known Vance for over twenty years. Accordingly, Vance was one of just three employees (including Fishman) who had access to all of Plaintiffs' trade secrets and other confidential business information.

4.     In approximately February or March 2005, Vance breached his position of trust with Alpha by working directly and independently with Alpha's China-based joint venture partner and tire manufacturer, Guizhou Tire Company ("GTC"). Vance misappropriated Plaintiffs' trade secrets and encouraged Alpha's customers to cancel their orders with Alpha and place their orders directly with GTC.

5.     In June 2005, Alpha brought a lawsuit against Vance in Florida state court, seeking to hold Vance liable for this wrongful conduct. *See Tire Engineering and Distribution, LLC v. Vance*, No. 2005-CA-005280 (Cir. Ct. Fl.) ("the Florida Litigation"). At the time of filing the Florida Litigation, Plaintiffs were unaware Vance had any connection with Al Dobowi or LingLong.

6.     In June 2007, during discovery in the Florida Litigation, Fishman discovered the conspiracy among Al Dobowi, Vance and LingLong to steal and profit from Plaintiffs' trade secrets. Fishman learned that in April or May 2005, Vance met with two men from Al Dobowi, a Dubai-based international tire distributor, at the Jefferson Hotel in Richmond, Virginia (the "Richmond Meeting"). The two men from Al Dobowi at the Richmond meeting were Surender Kandhari, the Chairman and Managing Director of Al Dobowi, and John Canning, a consultant for Al Dobowi between 2003 and 2006. Canning has known Jordan Fishman for many years, and he was employed by Alpha prior to selling his company to Al Dobowi and then consulting for Al Dobowi.

3

7.      At the meeting, Vance made a proposal to Al Dobowi that would enable the company to steal Alpha's underground mining tire business. Vance specifically offered to provide Al Dobowi with Alpha's customer lists, pricing information, customer databases and – most importantly – the proprietary blueprints drawn by Fishman necessary to make molds of Alpha's highly specialized tires.

8.      Kandhari, on behalf of Al Dobowi, accepted Vance's offer to enter into a scheme to steal and misappropriate Plaintiffs' trade secrets. After the Richmond Meeting, Vance, Kandhari, and Canning traveled to China to find a manufacturer to produce tires for Al Dobowi based on Alpha's proprietary blueprints. Al Dobowi initially approached Alpha's joint venture partner, GTC, about purchasing the molds for Alpha's tires, but no agreement was reached. Al Dobowi thereafter met with representatives of LingLong. LingLong ultimately agreed to join the conspiracy and executed a contract with Al Dobowi to manufacture tires using Plaintiffs' proprietary blueprints.

9.      In connection with this conspiracy, Vance began working for Al Dobowi in the Summer of 2005 from his office in Tazewell, Virginia. From his Virginia office, Vance communicated with Al Dobowi and LingLong employees about forwarding Plaintiffs' blueprints of the tire designs from which molds were made. By late 2005, Vance provided both Al Dobowi and LingLong with a full set of the Plaintiffs' drawings. LingLong then copied these drawings so it could make molds and produce the tires. Between late 2005 and early 2006, Vance also provided Al Dobowi with Alpha's customer lists and pricing information.

10.     From the time that Al Dobowi and LingLong entered the conspiracy, both companies knew or should have known that the confidential and proprietary trade secrets that Vance provided to them actually belonged to Alpha and Fishman.

4

11.     By the end of the first quarter of 2006, Al Dobowi and LingLong were producing nearly the full range of Alpha's underground mining tires and were filling orders for customers once loyal to Alpha, all without any compensation to and without knowledge or approval of Plaintiffs. Al Dobowi's wrongful conduct and the conspiracy among Al Dobowi, Vance and LingLong resulted in a tremendous loss of business for Alpha, which in turn caused Alpha to shrink from a company with twenty-five employees and fourteen distributors, to one with just five employees and three distributors.

12.     On November 2, 2007, after the scope of damages of the Florida Litigation was expanded to include Vance's misappropriation of Alpha's trade secrets to Al Dobowi and LingLong, the Florida state court entered a default judgment against Vance "due to [Vance's] willful violations of the Court's orders." (Exhibit A, Default Judgment).

13.     On January 24, 2008, the Florida court entered final judgment in favor of Alpha, and against Vance. The court found that Vance provided Al Dobowi with Alpha's trade secrets, including Alpha's tire drawings, profit-margin reports, production schedules, and buying prices, and thus enabled Al Dobowi to enter the market for underground mining tires. (*Id.* ¶¶ 11, 16, 17, 18, and 47). The court also found that Alpha has suffered and continues to suffer irreparable damage because of Vance's theft of Alpha's trade secrets. (*Id.* ¶ 42).

14.     In recognition of the financial devastation brought on Alpha, the court awarded to Alpha and against Vance compensatory damages in the amount of $19,658,730 and exemplary damages in the amount of $39,317,460.

15.     The Final Judgment is being appealed by Vance on a number of grounds, including the assertion that the Florida court lacked jurisdiction. On information and belief, Vance has fled the country and currently resides in China.

5

16.     Accordingly, Plaintiffs bring this action against Al Dobowi to recover for Plaintiffs' losses.  Plaintiffs allege claims for business conspiracy in violation of Virginia law, civil conspiracy, misappropriation of trade secrets, tortious interference with business relationships, copyright infringement, trademark infringement, unfair competition, unjust enrichment, and conversion based on Al Dobowi's role in the conspiracy to steal Alpha's trade secrets and confidential business information and Al Dobowi's vicarious liability for acts Vance committed in the course and scope of his employment with Al Dobowi.

## II.     PARTIES

17.     Tire Engineering and Distribution, LLC ("TED") is a Florida Limited Liability Company doing business as Alpha Tyre Systems and/or Alpha Mining Systems.  TED is a joint venture between Bcatco A.R.L. and GTC, each of which owned 50 percent of TED.  Jordan Fishman was the sole owner of Bcatco A.R.L.  TED designs, develops and distributes industrial tires, including those used for underground mining vehicles.  TED's principal place of business is 2535 Bee Ridge Road in Sarasota County, Florida.  TED also had an office in Virginia that Sam Vance operated before Vance quit working for Alpha in May 2005 to join Al Dobowi.  In May 2006, GTC sold, assigned and transferred its entire interest in TED to TED.

18.     Jordan Fishman, a United States citizen and resident of Florida, is the founder and CEO of TED.  Fishman created all of the drawings used to make the molds to produce Alpha's tires.  Fishman owns copyrights to some of these drawings, including copyrights for drawings of underground mining tires.  Fishman also created and owns distinctive marks that are displayed on Alpha's underground mining tires and is the owner of a registered trademark for *Mine Mauler*, which refers to the full line of Alpha's underground mining tires.

6

19.     On information and belief, Defendant Al Dobowi, Ltd. is a corporation with its principal place of business in Dubai, United Arab Emirates.  On information and belief, Defendant Al Dobowi Tyre Company, LLC is a limited liability company with its principal place of business in Dubai, United Arab Emirates.  Al Dobowi distributes commercial tires, specialized automotive parts and automotive accessories in the Middle East, Africa, South Asia, Canada and parts of Europe.  Al Dobowi sells both its own brands of tires and other tire companies' brands.  Surender Kandhari is the Chairman and Managing Director of Al Dobowi. Kandhari manages Al Dobowi with his two sons, Harjeev Kandhari and Jasjeev Kandhari. Starting in approximately August 2005, Al Dobowi operated an office out of Tazewell, Virginia that was run by Sam Vance.

### III.     JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over Al Dobowi under Federal Rule of Civil Procedure 4(k)(1)(a) and Virginia's long-arm statute, Va. Code § 8.01-328.1, because Al Dobowi engaged in wrongful conduct and conspired against Plaintiffs in the Commonwealth of Virginia, and Plaintiffs' claims arise out of the conspiracy.  This Court also has personal jurisdiction over Al Dobowi because, among other reasons, Al Dobowi transacted business in Virginia for purposes of Va. Code § 8.01-328.1(A)(1).

21.     This Court has subject matter jurisdiction based on diversity of citizenship because the matter in controversy exceeds the sum or value of $75,000, and Alpha and Fishman are citizens of different states and countries from Al Dobowi.  *See* 28 U.S.C. § 1332.  This Court also has subject matter jurisdiction over the copyright-infringement, trademark-infringement, and unfair-competition claims based on the court's federal-question jurisdiction.  *See* 28 U.S.C.

7

§ 1331. Lastly, the court has supplemental jurisdiction over the state law claims because the

state law claims are so related to the federal claims in this action that they form part of the same

case or controversy. *See* 28 U.S.C. § 1367.

22.      Venue is proper in this Court under 28 U.S.C. § 1391(a)(2), because the events

giving rise to the claims occurred in the Eastern District of Virginia. Specifically, the conspiracy

to steal Plaintiffs' trade secrets and the other tortious acts alleged in this complaint was initiated,

executed and facilitated in this District.

## IV.    **FACTUAL ALLEGATIONS**

### A.    Alpha's Unique Underground Mining Tires

23.      Since 1960, Jordan Fishman has been designing and developing high-end

industrial tires. Fishman has created approximately 500-600 drawings for molds of tires for

Alpha and other companies he has owned. Among Fishman's seminal drawings were those for

underground mining tires.

24.      Manufacturers of original mining equipment traditionally bought their specialized

underground mining tires from large tire companies, such as Goodyear and Michelin. As these

large companies became less interested in producing small quantities of specialized tires,

Fishman and Alpha invested extensively to fill the need for a developer of specialized

underground mining tires and to gain the trust of equipment manufacturers.

25.      Fishman and Alpha designed tires unique in numerous ways from any others

produced prior to 2005, including the sizes in which the tires were available. The tire size is

crucial for manufacturers of underground mining equipment because of the small, confined

spaces in which the machines must operate. Fishman also designed and developed tire rims in

8

novel sizes to accompany the uniquely sized tires. The tires and rims were designed to meet the specific needs of manufacturers for particular equipment used in underground mining. John Canning, who consulted for Al Dobowi, admitted in his deposition testimony in the Florida Litigation that when one of Fishman's tires in a novel size was unveiled at a trade show, "[e]verybody's reaction was incredible because . . . it was something so different for the industry."

26.    Fishman created distinctive number combinations to appear on the tires and identify each tire size. These marks included 1425x450-25, 1425x450-34, 57x2800-27, 57x2500-27, 48x2500-25.1, and 1320x355-23, among others. These numbers do not reflect actual measurements of the tires, but rather are random combinations created by Fishman.

27.    Fishman's tire designs were unique in numerous other respects, including but not limited to, novel tread patterns, unique ply ratings, an Alpha-designed rimgard, and a patent-pending OUTSIDEWALL design. To identify different tread patterns on the tires, Fishman created the markings *L-6T*, *L-6T+* and *EDT*. These markings have no significance apart from the tires to which they refer or are affixed and thus are fanciful and inherently distinctive. Fishman also created the distinctive and fanciful mark △ Recap in conjunction with his novel mechanism for indicating when a tire needs to be recapped. The symbol △ Recap appeared in four places on the Alpha underground mining tires. Finally, Fishman created the distinctive name *Mine Mauler*, which was abbreviated *M.M*, to refer to Alpha's unique line of underground mining tires.

28.    As the court found in the Florida Litigation, the unique features of Alpha's tires and the one-of-a-kind sizes gave Alpha a competitive advantage in its niche market.

9

**B.    Plaintiffs Took Significant Steps to Protect their Trade Secrets.**

29.    The blueprints that Fishman created were confidential, proprietary trade secrets of Alpha. The drawings provided the precise measurements to produce the molds to manufacture the inflated and uninflated tires, tread designs, sidewall configurations, tire sizes, tread patterns, key diameters, specific bead diameters and tapers, rim flange heights, ply ratings, vent hole positions, tire name and markings and other features necessary to develop Alpha's specialized mining tires. Fishman is the owner of copyrights on some drawings of molds to make underground mining tires. Without the precise specifications contained in the blueprints, Al Dobowi would not have been able to produce tires that are functionally identical to Alpha's tires and thus compete with Alpha in this highly specialized market.

30.    Fishman and Alpha own trademarks to protect the unique and distinctive markings on the tires and the *Mine Mauler* name. As such, the markings are confidential, proprietary trade secrets.

31.    Alpha's pricing information also constituted confidential and proprietary trade secrets. Alpha's pricing varied based on tire and wheel size, customer and location. For example, one of Alpha's specialized underground mining tires could sell for anywhere between $3,500 and $6,000. Accordingly, the pricing information provided Alpha with a valuable competitive advantage because the pricing was developed through years of experience regarding the demand for each type of tire, for each type of equipment in various local markets across the globe. Indeed, John Canning admitted in testimony elicited in the Florida Litigation that while he was employed with Alpha he was not provided with any buying price information because such information was "treated with utmost secrecy."

1275/001/1137217.1

32.    Alpha's profit-margin reports also included confidential and proprietary business information and trade secrets, such as hundreds of individual buying and selling prices broken down by customer, tire size and ply rating.

33.    Similarly, Alpha's monthly production schedules contained trade secrets about the timing and amount of production. Indeed, the production schedules were maintained in a database to which only a few, essential employees had access. Customers typically wanted a small number of these highly specialized underground mining tires, and the production schedules revealed the minimum number of tires a manufacturer was willing to produce. To profitably fill customers' orders, Alpha had to negotiate these production numbers with the manufacturer.

34.    Alpha's client databases also constituted confidential and proprietary trade secrets because, among other reasons, they included customer-specific information developed from years of learning the highly specific and changing needs of each of its clients. Indeed, each of Alpha's clients required different sizes, types and quantities of Alpha's specialized mining tires.

35.    All of the above referenced confidential and proprietary trade secrets were extremely valuable commodities to Plaintiffs that they used to develop and maintain a customer base loyal to Alpha and to run a successful, profitable business. In recognition of the value of the trade secrets, Alpha took extensive precautions to guard them. For example:

(a)    Alpha established two separate offices in China so that Alpha could limit access to the information. For instance, in one office, employees had access only to buying prices and costs, while in another office, at least three miles away, employees knew only selling prices and customer billing information. Employees were expressly forbidden from disclosing the information to which they had access.

11

(b)     To avoid inadvertent disclosure of pricing information to persons not permitted access to such information, Alpha used different color paper for each type of pricing information.  Information related to buying prices was printed on white paper, and information related to selling prices was printed on yellow paper.  Employees were aware that they needed permission to view certain colors of paper.

(c)     The production schedules were maintained in a database to which only a few, essential employees were given access.

(d)     Fishman kept blueprints locked in cabinets adjacent to his office or in his home.

(e)     The blueprints contained propriety markings that stated they were Alpha's property and that Alpha had to authorize in writing any reproduction.

(f)     Fishman registered copyrights for the drawings.

(g)     Fishman registered trademarks for *Mine Mauler* and created distinctive markings specifically for Alpha's tires.

(h)     Alpha did not permit GTC, its joint venture partner and the manufacturer of Alpha's tires, access to all of its trade secrets.

## C.      Vance Attempted to Steal Alpha's Business By Dealing Directly with GTC.

36.     In or around 1997, Fishman hired Vance to serve as Alpha's Marketing Manager. To successfully fulfill his duty of selling Alpha tires, Vance was given access to all of Plaintiffs' confidential and proprietary trade secrets.  Fishman hired Vance and entrusted him with this information because, at that time, Fishman had known Vance for over twenty years.

37.     Nonetheless, in February or March 2005, without Fishman's knowledge, Vance began working directly with Alpha's manufacturer, GTC, in order to cut Alpha out of the

12

business.  While being paid by Alpha, and unbeknownst to Fishman, Vance began receiving a direct commission from GTC in March 2005.

38.    At that time, Vance encouraged Alpha's customers to cancel their orders with Alpha and place their orders directly with GTC.  Using his Alpha email address, Vance told customers that there were "changes happening at Alpha" and that they needed to order tires directly through GTC.

39.    By April 2005, GTC had received Alpha's trade secrets and stopped shipping tires on behalf of Alpha.  At that time, Alpha had pending orders for tires totaling over $4 million.  Due to Vance's actions, these orders never were filled by Alpha.

40.    In April 2005, Vance sent an email to a GTC representative in China declaring: "we have our first order . . . This is only the start, we are going to get plenty of orders now that we have a system in place."

41.    Vance formally separated from Alpha in May 2005.

**D.    The Florida Litigation**

42.    In June 2005, Alpha initiated the Florida Litigation against Vance for his conduct in connection with GTC.

43.    In June 2007, during discovery in the Florida Litigation, Fishman discovered a different conspiracy involving Vance, Al Dobowi and LingLong.  On June 11, 2007, at John Canning's deposition, Alpha learned of the 2005 Richmond Meeting between Vance and Al Dobowi.  Fishman learned that in April or May 2005, Vance met with two men from Al Dobowi, a Dubai-based international tire distributor, at the Jefferson Hotel in Richmond, Virginia.  The two men from Al Dobowi were Surender Kandhari, the Chairman and Managing Director of Al Dobowi, and John Canning.

13

44.     Canning had worked for Alpha many years prior to consulting for Al Dobowi. During Canning's employment with Alpha, he never had access to Plaintiffs' confidential and proprietary drawings.

45.     At the Richmond Meeting, Al Dobowi was not yet in the business of selling tires for underground mining vehicles, so Vance inquired whether Al Dobowi was interested in entering that business. Vance offered to provide Al Dobowi with Alpha's customer lists, pricing information and – most importantly – the blueprints necessary to make molds of the tires.

46.     Al Dobowi apparently was eager to diversify its distribution line and decided to accept Vance's offer. After the Richmond Meeting, Vance, Kandhari, and Canning traveled to China to meet with representatives of GTC to determine whether Al Dobowi could buy Alpha's tire molds from GTC.

47.     Canning and Kandhari were told that GTC was stopping production for Alpha and taking orders directly from Vance. According to Canning, GTC informed him and Kandhari that the ownership of the molds was "a gray area." GTC admitted to Al Dobowi that the molds were built from Fishman's proprietary drawings.

48.     Although GTC did not agree to sell Al Dobowi the molds for Alpha's underground mining tires, Canning and Kandhari were confident that they could obtain the molds and thus continued to search for a manufacturer who would produce the Alpha tires for Al Dobowi. Their search brought them to LingLong, another Chinese tire manufacturer.

49.     After discussing the tremendous business opportunity that had arisen, LingLong and Al Dobowi entered into a contract for the production of Alpha's specialized underground mining tires.

14

50.     Al Dobowi later learned that GTC and Alpha had reached an agreement such that GTC was going to continue producing tires for Alpha.  Al Dobowi and LingLong did not alter their plans to begin manufacturing, producing and selling Alpha's tires in light of this information.  Moreover, neither Canning, Kandhari, nor any Al Dobowi representative contacted Fishman to discuss the situation or the ownership of the drawings.

**E.     Vance, Al Dobowi and LingLong Misappropriated Plaintiffs' Trade Secrets and Furthered the Conspiracy From Al Dobowi's Office in Virginia.**

51.     In August 2005, Al Dobowi formally hired Vance.  At that time, Vance was working for Al Dobowi from his office in Tazewell, Virginia.

52.     Once Vance became an Al Dobowi employee, Al Dobowi directed Vance to provide Al Dobowi and LingLong with a full set of blueprints of Alpha's tires.  According to John Canning's deposition testimony, Al Dobowi knew that Vance was incapable of designing tires or copying the drawings, so they assumed Vance would arrange for Alpha's drawings to be copied professionally.  Because GTC refused to sell Al Dobowi the molds, Al Dobowi had to obtain the drawings so LingLong could then create the molds for the tires.

53.     In his office in Tazewell, Virginia, Vance met on three occasions with Paula Owens, a drafting professor from a local college, and arranged for Owens to copy Alpha's blueprints.  Owens was able to copy some of the drawings.  Also from his Virginia office, Vance communicated with LingLong about sending the drawings to China.

54.     On September 1, 2005, Vance emailed Merry Wang, the export manager for LingLong, stating that as Vance understood it, LingLong was going to "make a recommendation as to how to change these drawings so [Al Dobowi's] tires would not look like the . . . Awful Alpha."

15

55.     In September 2005, Vance sent drawings of the molds for the Alpha tires from his Virginia office to LingLong. Vance later also supplied Al Dobowi with the drawings. Al Dobowi covered all of the expenses associated with the copying of Alpha's blueprints by Paula Owens.

56.     LingLong actually and exactly copied the Alpha drawings and used them to create molds for the tires. Without any prior expertise in manufacturing underground mining tires, LingLong ultimately became only the second company in the world to manufacture the highly specialized underground mining tires.

57.     In April 2006, an Al Dobowi employee stated in an email that he attempted to take off "those 'Alpha Mining' things from [the] drawings" but he could not do so because the drawings were in PDF format.

58.     In approximately August or September 2005, Vance provided Al Dobowi with the selling prices, which are the prices customers were paying for Alpha's tires, and the buying prices, which are the prices Alpha paid to buy the tires from the manufacturer. This information was essential for Al Dobowi to move forward with the conspiracy. Because Alpha's underground mining tires were such a unique product, Al Dobowi needed to meet the prices that Alpha's customers were paying to Alpha at the time.

59.     Vance also provided Al Dobowi with the weight for each specific tire, and the profit margins by size. This information also was crucial to Al Dobowi with respect to calculating potential profitability in part because Alpha purchased the tires based on weight.

60.     Al Dobowi asked Vance on many occasions for Alpha's customer list. Vance finally provided the list to Al Dobowi in February 2006. Vance also provided Al Dobowi with the specific size tire each customer was buying and the profit margin applicable to each tire size.

16

61.     Vance also gave Al Dobowi Alpha's contract with one of Alpha's largest customers, The Sandvik Group. Al Dobowi made a few changes to the contract and forwarded it to Sandvik as its own contract.

62.     In January 2006, Al Dobowi supplied Vance with a computer, but until that time Al Dobowi understood that Vance was using the laptop and desktop computers supplied by Alpha. The Alpha computers contained Plaintiffs' confidential and proprietary trade secrets. Also in January 2006, Vance transferred Plaintiffs' trade secrets from the Alpha computers to the Al Dobowi computer.

63.     On January 14, 2006, Kandhari sent an email to Merry Wang, the export manager for LingLong, instructing LingLong to go forward with development of twenty tire sizes. LingLong created the molds necessary to produce Alpha's underground mining tires. By the end of the first quarter of 2006, LingLong was producing for Al Dobowi almost a full line of tires using Alpha's stolen designs and other proprietary information. At that time, Al Dobowi had invested over $1.5 million in underground mining tires.

64.     Al Dobowi sold the tires under the brand name, Infinity. The first promotional flyer for Infinity contained pictures of Alpha tires, including the proprietary markings, but represented that the tires were the Infinity brand.

65.     The underground mining tires manufactured by LingLong and sold by Al Dobowi are identical to Alpha's underground mining tires in all significant measurements, dimensions, and specifications. The tires had to be identical or else they would not have fit the equipment for which they were specifically designed.

66.     The copied blueprints and tires also contain the same markings as Alpha's tires, including *M.M, L-6T, L-6T+, EDT* and the number combinations. Al Dobowi and LingLong

17

used these marks without realizing that Fishman simply created them and thus the marks have no

significance apart from the tires. Al Dobowi and LingLong used the name *Mine Handler* to refer

to the tires. In LingLong's tire catalog, it advertises mining tires with these marks. LingLong

also placed the symbol △ Recap on the underground mining tires in the same locations as Alpha

placed the symbol.

67.     Alpha's customers have expressed confusion and are likely to be confused about

whether the underground mining tires manufactured by LingLong are the same as Alpha's

underground mining tires because the tires are identical in all meaningful and recognizable

external respects, including having the same markings.

F.     **Plaintiffs Suffered Extensive Damages.**

68.     Plaintiffs have been financially devastated because of Al Dobowi's wrongful

conduct and the conspiracy among Al Dobowi, LingLong and Vance to steal and profit from

Plaintiffs' trade secrets.

69.     Prior to the theft of the trade secrets, Alpha had twenty-five employees and

fourteen large distributors. As a result of the loss of business caused by the conspiracy, Alpha

now has five employees and three distributors.

70.     For instance, one of Alpha's largest customers as of 2005, Sandvik Group, now

purchases underground mining tires from Al Dobowi, the very tires Alpha manufactures. Alpha

has lost substantial profits from sales diverted to Al Dobowi.

71.     Vance also diverted business opportunities intended for Alpha to Al Dobowi. For

example, in January 2006, Alpha client Borat Longyear sent an order to an Alpha fax machine

that still was in Vance's possession. Vance took the order and Al Dobowi filled it. As a result,

Alpha lost the customer and significant profits.

72.     Upon information and belief, LingLong continues to manufacture Alpha's underground mining tires for Al Dobowi, and Al Dobowi continues to market and distribute them.

73.     LingLong advertises the underground mining tires in its own catalog and, upon information and belief, sells the tires to entities in addition to Al Dobowi.

74.     Upon information and belief, Vance continues to sell Alpha's underground mining tires for Al Dobowi.

**G.      The Court Entered Final Judgment Against Vance in the Florida Litigation.**

75.     On November 2, 2007, the Florida state court entered default judgment against Vance "due to [Vance's] willful violations of the Court's orders." (Exhibit A, Default Judgment).

76.     On January 24, 2008, the Florida state court entered final judgment in favor of Alpha. The court made extensive findings of fact, including that:

    a.      Alpha's tire drawings, profit-margin reports, production schedules, and
            buying prices, are confidential, propriety, and trade secrets of Alpha. (*id.*
            ¶¶ 11, 16, 17, 18);

    b.      "Alpha took significant precautions to safeguard its trade secrets" (*id.*
            ¶ 21);

    c.      Vance provided Al Dobowi with Alpha's trade secrets and enabled
            Al Dobowi to enter the market for underground mining tires (*id.* ¶ 47);
            and

    d.      Alpha has and continues to suffer irreparable damage because of Vance's
            theft of Alpha's trade secrets. (*id.* ¶ 42).

19

77.     In recognition of the financial devastation brought on Alpha, the court awarded compensatory damages in the amount of $19,658,730.  (*Id.* at 12).

78.     The court further found that Vance had acted with specific intent to harm Alpha and that Vance's actions were willful and malicious.  Accordingly, the court awarded exemplary damages in the amount of $39,317,460.

79.     The Final Judgment is being appealed by Vance on, among other grounds, that the Florida court lacked jurisdiction.

80.     On information and belief, Vance has fled the country and currently resides in China.

## COUNT ONE

### (Violation of Virginia Business Conspiracy Statute)

81.     Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

82.     As set forth above, Al Dobowi, Vance and LingLong combined, associated, agreed, mutually undertook and acted in concert for the unlawful purpose of interfering with Alpha's business relationships, misappropriating Plaintiffs' trade secrets, infringing on Plaintiffs' copyrighted works and trademarks for their use and benefit, and unlawfully converting Plaintiffs' property.

83.     As of the Summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment to advance the conspiracy within and outside of Virginia.

84.     Al Dobowi, Vance and LingLong conspired to use Plaintiffs' trade secrets for their own enrichment.

20

85.     Al Dobowi, Vance and LingLong committed unlawful acts by obtaining Plaintiffs' trade secrets and using the information to injure Alpha.

86.     In conspiring against Plaintiffs, Al Dobowi, Vance and LingLong acted with malice because their actions were intentional, purposeful, and without lawful justification.

87.     As a direct and proximate cause of the conspiracy and the conspirators' willful and malicious acts, Plaintiffs have been injured in their trade, business, and profession. Among other damages, Plaintiffs have lost over $19 million in ongoing business, and Alpha's presence in the industrial tire market has drastically diminished. Plaintiffs also have been deprived of the profits that Al Dobowi gained from the unlawful use of Plaintiffs' trade secrets. Finally, Plaintiffs have suffered consequential injuries as a result of the conspiracy, including without limitation the attorneys' fees and expenses involved in the prosecution of this action, loss of goodwill, and other lost earnings.

88.     The combined actions of Al Dobowi, Vance and LingLong constitute a conspiracy to injure another (Plaintiffs) in their reputation, trade, business or profession in violation of Virginia Code § 18.2-499.

89.     Because of the conspiracy, every act committed in furtherance of the conspiracy is imputed to each conspirator.

90.     Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's actions while Vance was acting within the course and scope of his employment with Al Dobowi.

21

## COUNT TWO

### (Common Law Civil Conspiracy)

91.     Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

92.     Al Dobowi, LingLong and Vance combined, associated, agreed, mutually undertook, and acted in concert for the unlawful purpose of interfering with Alpha's business relationships, misappropriating Plaintiffs' trade secrets, infringing on Plaintiffs' copyrighted works and trademarks for their use and benefit, and unlawfully converting Plaintiffs' property.

93.     As of the Summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment to advance the conspiracy within and outside of Virginia.

94.     As set forth above, Al Dobowi, LingLong and Vance committed numerous acts in furtherance of the conspiracy. Moreover, each conspirator committed unlawful acts in furtherance of the conspiracy. Because of the conspiracy, every act committed in furtherance of the conspiracy is imputed to each and every conspirator.

95.     Plaintiffs have been and continue to be injured by the conspiracy in their trade, business, and profession. Among other damages, Plaintiffs have lost business as a direct result of the theft of Plaintiffs' trade secrets and confidential business information. Further, Plaintiffs have suffered consequential injuries as a result of the conspiracy. Plaintiffs' consequential injuries include, without limitation, the attorneys' fees and expenses involved in the prosecution of this action, loss of goodwill, and other lost earnings.

22

96.     Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's actions while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT THREE

### (Tortious Interference with Business Relationships)

97.     Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

98.     As of April 2005, Plaintiffs had developed numerous advantageous business relationships and had contracts with various individuals and organizations.

99.     The above relationships included, but were not limited to, agreements for Alpha to provide underground mining tires to individuals and organizations.

100.    Al Dobowi and Vance had knowledge of Plaintiffs' business relationships and Alpha's contracts to provide tires.

101.    As alleged above, Al Dobowi and Vance intentionally, unjustifiably and tortiously interfered with these business relationships and continue to do so to this date.

102.    As of the summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment to interfere with Alpha's business relationships.

103.    The intentional interference caused the disruption, breach and termination of many of Plaintiffs' business relationships.

104.    As a direct and proximate result of Al Dobowi's actions, Plaintiffs have suffered and continue to suffer irreparable damages.

23

105.    Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's tortious interference with Plaintiffs' business relationships that occurred while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT FOUR

### (Misappropriation of Trade Secrets)

106.    Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

107.    Plaintiffs' trade secrets included but were not limited to 1) blueprints used to produce the molds for the tires; 2) markings that referred to or were affixed to the underground mining tires; 3) the list of Alpha's customers and its customer database; 4) pricing information; 5) profit-margin reports; 6) modes of operation; and 7) production schedules.

108.    Plaintiffs' trade secrets are economically valuable commodities. Plaintiffs acquired the trade secrets only after years of extensive work and capital investment. Plaintiffs developed a customer base through years of client development and information gathering.

109.    Plaintiffs derived independent economic value, both actual and potential, from these trade secrets not being generally known to or readily ascertainable by proper means by other persons.

110.    These trade secrets were confidential within Alpha and were shared with certain employees of Alpha through express and implied confidence. The trade secrets were not known outside of Alpha's business.

111.    As alleged above, Plaintiffs took significant precautions to safeguard their trade secrets, including but not limited to keeping blueprints in locked cabinets; registering copyrights

24

and trademarks, requiring confidentiality from Alpha employees, maintaining a close watch on client contacts, and restricting the use of the trade secrets to certain personnel in certain places.

112.    Al Dobowi and Vance used improper means to acquire knowledge of Plaintiffs' trade secrets, including conspiring to make unauthorized copies of the copyrighted blueprints and sensitive product designs and to steal Alpha's customer list and pricing information.

113.    Sam Vance owed a duty to Plaintiffs to maintain the secrecy of Plaintiffs' trade secrets. Al Dobowi knew or had reason to know that Sam Vance owed Plaintiffs this duty and that Vance breached his duty by offering to misappropriate the trade secrets and then delivering the trade secrets. Furthermore, Al Dobowi knew or had reason to know that Sam Vance utilized improper means to acquire the trade secrets.

114.    As of the summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment to misappropriate Plaintiffs' trade secrets.

115.    Al Dobowi and Vance's misappropriation of Plaintiffs' trade secrets was willful and malicious.

116.    Al Dobowi and Vance's use of the trade secrets and confidential business information has resulted and will continue to result in their unjust enrichment, and has damaged and will continue to damage Plaintiffs' business and business interests.

117.    Al Dobowi is vicariously liable for any damages resulting from Vance's misappropriation of trade secrets while Vance was acting within the course and scope of his employment with Al Dobowi.

1275/001/1137217.1

## COUNT FIVE

### (Copyright Infringement)

118.     Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

119.     The product designs for Alpha's industrial tires represent original creations and inventions.  Plaintiffs owned copyrights of drawings of the molds used to create the tires and thus the drawings were protected under 17 U.S.C. § 102(a)(5).  The drawings graphically portrayed industrial tires for the purpose of conveying information as to size, form, assembly and appearance of underground mining tires.

120.     Al Dobowi and Vance conspired to and ultimately did violate Plaintiffs' exclusive rights by reproducing the drawings, manufacturing tires based on the drawings, and selling and distributing those tires in the public.

121.     As of the summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment to copy the drawings and violate Plaintiffs' exclusive rights.

122.     LingLong also copied Plaintiffs' drawings and manufactured and continues to manufacture tires using molds developed from the copyrighted drawings.

123.     Al Dobowi sold and distributed and continues to sell and distribute tires produced from the copyrighted drawings.

124.     The infringement by Al Dobowi of Plaintiffs' copyrights has caused, proximately caused and continues to cause damage to Alpha's business and business interests, including but not limited to lost profits and the unjust enrichment of Al Dobowi.

26

125.    Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's infringement of Plaintiffs' copyrights that occurred while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT SIX

### (Trademark Infringement)

126.    Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

127.    Plaintiffs have caused Alpha's underground mining tires to be manufactured and distributed with the mark *Mine Mauler*. Plaintiffs have a registered federal trademark for *Mine Mauler*.

128.    The mark is distinctive and was created by Fishman specifically to refer to Alpha's line of underground mining tires. Plaintiffs have continuously used the mark *Mine Mauler* in connection with the underground mining tires they designed, developed and sold.

129.    Al Dobowi and Vance manufactured and sold or caused to be manufactured and sold underground mining tires containing the mark *Mine Handler*. The mark *Mine Handler* used by Al Dobowi on its underground mining tires is substantially and confusingly similar to Plaintiffs' registered mark. Al Dobowi and Vance's conduct has caused a likelihood of confusion between the underground mining tires manufactured and sold by Plaintiffs and those manufactured by LingLong and sold by Al Dobowi.

130.    Al Dobowi's conduct constitutes an infringement of Plaintiffs' registered mark under § 1114 of the Lanham Act (15 U.S.C. § 1114) and has damaged Plaintiffs' business and business interests, including but not limited to lost profits and the unjust enrichment of Al Dobowi, and injury to Plaintiffs' goodwill in the mark.

27

131.    Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's infringement of Plaintiffs' trademarks that occurred while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT SEVEN

### (Unfair Competition and Deceptive Trade Practices)

132.    Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

133.    Plaintiffs have caused Alpha's blueprints and underground mining tires to be manufactured and distributed with the marks *M.M*, *L-6T*, *L-6T+*, *EDT*, △ Recap, 1425x450-25, 1425x450-34, 57x2800-27, 57x2500-27, 48x2500-25.1 and 1320x355-23. The marks are fanciful because they were created specifically for Alpha's underground mining tires and have no separate significance apart from the tires to which they refer or are affixed.  Plaintiffs' marks are inherently distinctive and entitled to protection under § 1125 of the Lanham Act.

134.    Plaintiffs have continuously used the marks in connection with underground mining tires.

135.    Al Dobowi and Vance have manufactured and sold or caused to be manufactured and sold underground mining tires containing the marks *M.M*, *L-6T*, *L-6T+*, *EDT*, △ Recap, 1425x450-25, 1425x450-34, 57x2800-27, 57x2500-27, 48x2500-25.1 and 1320x355-23. These marks are substantially and confusingly similar to the marks owned by Plaintiffs.

136.    Al Dobowi and Vance, by their unauthorized appropriation and use of Plaintiffs' marks, have conspired to and have engaged, and are continuing to engage, in acts of wrongful deception of the purchasing public, wrongful designation as to the source and sponsorship of goods, wrongful deprivation of Plaintiffs' good name and reputation and the wrongful

28

deprivation of Plaintiffs' right to public recognition and credit as the true source of the underground mining tires.

137.    Al Dobowi's actions have resulted in consumer confusion as to the source of the underground mining tires manufactured by LingLong and sold by Al Dobowi. Such conduct constitutes an unfair trade practice and unfair competition under section § 1125(a) of the Lanham Act and § 59.1-92.12 of the Virginia Code.

138.    These acts of unfair competition and unfair trade practices against Plaintiff have damaged Plaintiffs' business and business interests, including but not limited to lost profits and the unjust enrichment of Al Dobowi, and injury to Plaintiffs' goodwill in the mark.

139.    Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's infringement of Plaintiffs' trademarks that occurred while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT EIGHT

### (Conversion)

140.    Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

141.    Plaintiffs own and have the right to possess its confidential business information, product designs and trade secrets.

142.    Al Dobowi and Vance took and reproduced Plaintiffs' confidential business information, product designs and trade secrets. Through these affirmative acts, Al Dobowi and Vance wrongfully exercised authority over and deprived Plaintiffs of their right to exclusive use of their property.

29

143. As of the summer of 2005, Vance was an employee of Al Dobowi and acted within the course and scope of his employment.

144. As a direct and proximate result of Al Dobowi's conversion of the property for its own use, Plaintiffs have suffered and continue to suffer damage to their business and business interests.

145. Al Dobowi is vicariously liable for any damages caused or proximately caused by Vance's conversion of Plaintiffs' property that occurred while Vance was acting within the course and scope of his employment with Al Dobowi.

## COUNT NINE

### (Unjust Enrichment)

146. Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

147. Al Dobowi has received benefits from the wrongfully obtained product designs, customer lists, confidential business information and trade secrets.

148. Al Dobowi intended to receive these benefits from Plaintiffs' product designs, customer lists, confidential business information and trade secrets.

149. It would be inequitable for Al Dobowi to retain the benefits it has received from the conspiracy to steal Plaintiffs' trade secrets and its tortious interference with Plaintiffs' business relationships without paying for the value.

150. To the extent that Al Dobowi has been unjustly enriched by the unauthorized and unlawful use of Plaintiffs' product designs, customer lists, confidential business information and trade secrets, Plaintiffs are entitled to recover the value of the benefits conferred.

30

## JURY REQUEST

151.    Plaintiffs demand a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Al

Dobowi as follows:

a.  An award of all monetary damages incurred by Plaintiffs due to Al Dobowi's tortious

and unlawful acts and any acts for which Al Dobowi is vicariously liable, including

but not limited to the actual losses sustained by Plaintiffs due to Al Dobowi's tortious

and unlawful acts, and any such profit realized by Al Dobowi as a result of its tortious

and unlawful acts;

b.  An award of the actual damages suffered by Plaintiffs as a result of Al Dobowi's

copyright infringement, and any profits of Al Dobowi that are attributable to the

infringement under 17 U.S.C. § 502, or Al Dobowi's unfair trade practices, unfair

competition, or trademark infringement;

c.  An injunction enjoining Al Dobowi and its agents, servants and employees from

infringing in any manner on Plaintiffs' proprietary and confidential trade secrets,

including Plaintiffs' registered copyrights and trademarks.

d.  An award of treble damages and attorneys' fees pursuant to Virginia Code § 18.2-

500;

e.  An award of appropriate exemplary damages for Al Dobowi's willful and malicious

misappropriation, interference and infringement;

31

f.  An award of all the costs and expenses of suit incurred by Plaintiffs; and

g.  An award for such other and further relief as this Court deems just and proper.

Dated: October 28, 2009            Respectfully submitted,

By: _William E Copley_____

David B. Killalea
Virginia Bar. No. 29304
William E. Copley
Virginia Bar #43960
Attorneys for Plaintiffs
GILBERT LLP
1100 New York Avenue NW
Suite 700
Washington, D.C. 20005
Telephone:  (202) 772-2200
Facsimile:  (202) 772-2282
killalead@gotofirm.com
copleyw@gotofirm.com

32