F I L E D

JUL 2 1 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| IN RE: OUTSIDEWALL TIRE | ) | Case No. 1:09cv1217 |
| LITIGATION | ) | |

## ORDER

At issue on defendants' Rule 50(b) motion after a jury verdict for plaintiffs in this

copyright, trademark, conversion, and civil conspiracy matter is whether the evidence adduced at

trial was sufficient to support the jury's verdict. The matter was briefed and argued, and is now

ripe for disposition.

**I.**

Plaintiffs in this consolidated case are (i) Jordan Fishman, a Florida citizen, and three

companies he owns and controls: (ii) Tire Engineering & Distribution LLC ("TED"), a Florida

limited liability company, (iii) Bearcat Tire ARL, LLC ("Bearcat"), also a Florida LLC, and (iv)

Bcatco A.R.L., Inc. ("Bcatco"), which is incorporated under the laws of the Jersey Channel

Islands. During times relevant to this litigation, plaintiffs were in the business of designing,

manufacturing, and marketing rubber tires for use on underground mining vehicles.

Defendants (i) Al Dobowi, Ltd., (ii) Al Dobowi Tyre Co., LLC, (iii) TyreX International,

Ltd., and (iv) TyreX International Rubber Co., Ltd. (collectively "Al Dobowi defendants") are

corporations based in the United Arab Emirates and owned by defendant (v) Surender Kandhari,

a citizen of Dubai. Defendants (vi) Shandong Linglong Rubber Co., Ltd. and (vii) Shandong

Linglong Tire Co., Ltd. (collectively "Linglong defendants") are incorporated and based in

China. All defendants are in the business of designing, manufacturing, and marketing rubber

tires.

During a six-day jury trial, plaintiffs presented live and videotaped testimony from several witnesses, including (i) Sam Vance, plaintiffs' former employee and an alleged employee of Al Dobowi defendants, (ii) Surender, Harjeev, and Jasjeev Kandhari, who together operate the Al Dobowi defendant entities, (iii) John Canning, a tire design consultant to Al Dobowi defendants with personal knowledge of the alleged conspiracy, and (iv) Merry Wang, an executive with Linglong defendants. Plaintiffs also presented documentary evidence, primarily e-mail exchanges between the alleged co-conspirators admitted pursuant to Rule 801(d)(2)(E), Fed. R. Evid. Defendants presented live testimony from Jasjeev Kandhari and Mary Wang. The parties also presented competing expert witnesses on the issues of infringement and damages.

In sum, the evidence adduced at trial was sufficient to allow a reasonable juror to conclude as follows:

- In the first week of May 2005, Surender Kandhari and John Canning, both representing one or more Al Dobowi defendants, met with Sam Vance in the lobby of the Jefferson Hotel in Richmond, Virginia.[1] During this hourlong meeting, Vance, Canning, and Surender Kandhari discussed the possibility of Al Dobowi defendants—which had never before manufactured or sold mining tires—producing a line of mining tires based on plaintiffs' line of mining tires, known as "Alpha tires."[2]

- Immediately following the Richmond meeting, on May 9, 2005, Vance e-mailed Surender Kandhari from his home in Tazewell, Virginia, indicating that he was "working on our business plan," and that he was in contact with Linglong defendants (then operating as Guizhou Tire Company) and with the General Manager of GTC, the Chinese company that was plaintiffs' primary mining tire manufacturer.[3]

---

[1] Tr. July 8, 2010 at 532 (testimony of John Canning).

[2] *Id.* at 533–36.

[3] *Id.* at 656–59 (testimony of Sam Vance).

- Thereafter, in June 2005, Vance, Surender Kandhari, and Canning met with GTC in China.[4] The purpose of the meeting was to attempt to purchase molds of plaintiffs' Alpha tires from GTC. But GTC informed Al Dobowi defendants' that it believed that there was a "gray area" surrounding ownership of the Alpha tire molds, and that insofar as they may be owned by plaintiffs, GTC could not sell them to Al Dobowi defendants.[5]

- In August 2005, Al Dobowi defendants hired Vance as their "Business Development Director" with a salary of approximately $8,000 per month, and an additional health insurance allotment of $800 per month.[6] Indeed, Surender Kandhari went to pains to emphasize that Vance was not merely being hired as a "consultant," and that Al Dobowi defendants wanted Vance "to be full time committed in developing business whether it be for underground mining Tires or OTR retreads or any other business."[7] Surender Kandhari's e-mail confirming Vance's employment also specifically noted that Vance was to be "based in the USA," presumably from Vance's Tazewell, Virginia home.

- Vance apparently retained blueprints belonging to plaintiffs without plaintiffs' permission even though a warning on the drawings indicated that they were confidential, and that reproduction or other use must be expressly authorized in writing.[8]

- By September 2005, Vance was working with Linglong defendants to adapt the Alpha tire blueprints into drawings for Al Dobowi defendants' new "Infinity Mining tires" series. Vance indicated in a contemporaneous e-mail to Merry Wang that he was performing this work from his "office in Tazewell, [V]a., USA," and that specifically, he was working "on the 2

---

[4] *Id.* at 537; 659 (testimony of Canning and Vance).

[5] *Id.* at 539 (testimony of Canning).

[6] Pl. Ex. 94 (e-mail from Surender Kandhari to Vance).

[7] *Id.*

[8] Pl. Ex. 153.

drawings."[9] In this e-mail message dated September 1, 2005, Vance sought to confirm that Linglong defendants' engineering department was "working on the reccommendations [sic] for the changes to the drawings" to ensure that "our Infinity Mining tires would not look like the AA (Awful Alpha) Ha!"[10]

- In a September 8, 2005 e-mail from Canning to Vance, to which the three Kandharis were copied, Canning asked Vance a series of questions about Vance's proposed drawings, noting: "I understand we can't copy exactly what Jordan [Fishman] has done but as I said the tyre has to look the part."[11]

- Vance, Canning, and Linglong defendants proceeded to design new tire blueprints and molds based on the Alpha tire blueprints, despite having ample notice—including several communications from plaintiff Jordan Fishman—that the blueprints contained protected intellectual property. Indeed, in a September 22, 2006 e-mail from Vance to Sean DeCosta, an Al Dobowi sales manager, Vance notes: "Please remember we copied existing products in the field."[12]

- Al Dobowi defendants and Linglong defendants proceeded to design, manufacture, and sell Infinity tires based on the Alpha tire blueprints. Tires based on Alpha's "Mine Mauler" series were renamed "Mine Handler"; additionally, the sidewall of the Infinity tires bore the acronym "M.M.", an acronym that Fishman said plaintiffs would occasionally use when there was insufficient space to spell out "Mine Mauler."

- Additionally, the Infinity Tire's sidewall also contains the marking "L-6T", a marking that also appears on Alpha tires. As Vance acknowledged in an e-mail message to a Linglong employee, the L-6T mark suggests a tire with significant tread depth, but the mark itself has no technical

---

[9] Pl. Ex. 100 (e-mail from Vance to Merry Wang). The e-mail says "Na." and not "Va.", but Vance acknowledged in his videotaped testimony that this was a typographical error and that he was, in fact, referring to his home in the Commonwealth of Virginia. *See* Tr. July 8, 2010 at 697 (testimony of Vance).

[10] Pl. Ex. 100.

[11] Pl. Ex. 25.

[12] Pl. Ex. 26.

meaning; to the contrary, "this was only a marketing thing."[13] The Tyre & Rim Association standards for tread depth measurement range from L-1 to L-5; an Alpha tire branded as L-6T had an L-5 tread depth rating. In the September 2006 e-mail to DeCosta, Vance notes: "The brand copied used a marketing stratigy [sic] of L-6 to give the impression of having the most tread depth. So as not to give the imression [sic] of having less we copied the L-6 T strategy."[14] This message strongly indicates that defendants chose to use the L-6T mark on the basis of the meaning that plaintiffs' use of the L-6T mark had acquired in the industry.

- Both the Alpha tires and the Infinity tires carried the mark "Δ Recap". There was disputed evidence as to whether the "Δ" mark is arbitrary, or whether it is in fact commonly used on tires to indicate the point at which a tire needs to be retreaded.[15]

- Additionally, defendants used various other marks found on Alpha tires—the acronym "EDT" for "extra deep tread," and various tire sizes.[16] No evidence was adduced that any of these marks acquired a secondary meaning in the industry.

- Beginning in early 2006, and continuing to the present day, defendants have manufactured, marketed, and sold Infinity mining tires based on plaintiffs' Alpha tire blueprints. It is clear that Vance's original copying and adaptation of plaintiffs' blueprints occurred in Tazewell, Virginia. Less clear is when Vance's activities in Virginia ceased, if at all—a March 2006 e-mail from Vance indicated that he planned to move to China to continue his work for Al Dobowi defendants, but that he would continue

---

[13] Pl. Ex. 36.

[14] Pl. Ex. 26.

[15] Tr. July 7, 2010 at 233–34 (testimony of Jordan Fishman); Tr. July 13, 2010 at 1177 (testimony of Mark Mineur).

[16] In his trial testimony, Fishman claimed that the tire size marks were not in fact descriptive as the tires were generally one or two inches off from the sizes indicated by the marks. This does not make the marks any less descriptive; it merely renders them *inaccurately* descriptive. *See id.*

to sell tires in the United States.[17] It is, however, clear that Linglong defendants have continued to manufacture Infinity Mining tires for Al Dobowi defendants in China from early 2006 to the present day.

At the close of the plaintiffs' case, defendants timely filed a motion for judgment of acquittal pursuant to Rule 50(a), Fed. R. Civ. P. In their motion, defendants argue that judgment in their favor is warranted because

    (i)     plaintiffs failed to serve Surender Kandhari in his capacity as an individual defendant;

    (ii)    plaintiffs failed to prove that personal jurisdiction exists over defendants;

    (iii)   there was insufficient evidence that plaintiffs had a right to possess the allegedly converted property, namely the Alpha tire blueprints;

    (iv)   the conversion claim is preempted by the federal Copyright Act;

    (v)    the evidence was insufficient to sustain a civil conspiracy claim;

    (vi)   the civil conspiracy claim is preempted by the Copyright Act;

    (vii)  the copyright infringement, trademark infringement, and unfair competition claims are based only on acts outside the United States and thus do not state a valid claim for relief under the Copyright Act and Lanham Act;

    (viii) the evidence is insufficient to sustain a claim of copyright infringement; and

    (ix)   the evidence is insufficient to sustain a claim of trademark infringement or unfair competition.

Plaintiffs oppose defendants' motion, arguing that the evidence was sufficient to sustain judgments in their favor on all counts, and the motion was argued on Friday July 16, 2010.

---

[17] Pl. Ex 122.

Ultimately, the Court exercised its discretion under Rule 50(b) to submit the action to the jury subject to subsequent disposition of a renewed motion for judgment of acquittal. The renewed motion having now been filed and freshly opposed by plaintiffs, further briefing and argument are dispensed with as they would not aid the decisional process. For the reasons that follow, defendants' motion must be granted in part and denied in part.

## II.

The standard for evaluating a motion for judgment as a matter of law is too well settled to require elaboration here. Simply put, the motion must be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue." Rule 50(a), Fed. R. Civ. P. Put another way, judgment as a matter of law must be entered when "'a reasonable trier of fact could draw only one conclusion from the evidence,'" namely the conclusion that the non-moving party cannot prevail on that issue or claim. *GSM Dealer Servs., Inc. v. Chrysler Corp.*, 32 F.3d 139, 142 (4th Cir. 1994) (quoting *Townley v. Norfolk & W. Ry. Co.*, 887 F.2d 498, 499 (4th Cir. 1989)). Thus, if the jury reasonably could have found for plaintiffs on any of the issues raised in defendants' motion, then the motion must be denied in that respect.

## III.

A. Service of Surender Kandhari

Defendants first argue that Surender Kandhari must be dismissed as an individual plaintiff in this case because he was never served in that capacity. This argument succeeds inasmuch as plaintiffs agree that they never served Surender Kandhari in his individual capacity.

B. Personal Jurisdiction

Defendants next contend that plaintiffs have failed to present sufficient evidence that the Court could properly exercise personal jurisdiction over each of them. Defendants argue that they have no contacts with Virginia and that none of the tortious acts of which they were accused occurred in Virginia. Ultimately, defendants' argument fails as it impermissibly requires adopting their version of disputed factual issues for purposes of ruling on this Rule 50 motion.

To begin with, defendants claim that a May 2005 meeting in the lobby of the Jefferson Hotel in Richmond, Virginia between Sam Vance and Al Dobowi defendants (represented by Surender Kandhari and John Canning) was about purchasing "tire fill" and was unrelated to the alleged conspiracy. On the other hand, plaintiffs claimed that the conspiracy between Vance and Al Dobowi defendants was hatched at this meeting, and they presented ample evidence to support their claim. In his testimony, Canning stated that the subject of the meeting was not "tire fill," but rather was about Al Dobowi defendants starting a mining tire business based on plaintiffs' designs.[18] And, moreover, there was ample circumstantial evidence that the conspiracy was discussed at this meeting. Al Dobowi defendants had never before been involved in the mining tire business, nor had any of the Kandharis ever had any contact with Sam Vance or any of plaintiffs. Nonetheless, immediately prior to the meeting, Canning had sent Surender Kandhari plaintiffs' Alpha tire sales figures, and immediately after the meeting, Vance began to work on obtaining Alpha tire molds from GTC, and communicated with Linglong defendants about manufacturing a new line of tires for Al Dobowi defendants. In short, defendants'

---

[18]  Tr. July 8, 2010 at 532 (testimony of John Canning).

contention that the Richmond meeting was only about "tire fill" was not credible. In these circumstances, it was entirely reasonable for the jury to conclude from the evidence presented at trial that the primary purpose of that meeting was to conspire to convert plaintiffs' property and to infringe on their trademarks and copyrights. Thus, as the claims in this case directly arose out of that meeting, the jury reasonably could have concluded that personal jurisdiction existed over Al Dobowi defendants.

This does not end the analysis, however, as Linglong defendants were not present at the Richmond meeting and thus their co-conspirators' participation in this meeting is probably not, without more, sufficient to establish that Linglong defendants purposefully availed themselves of the benefits of Virginia. *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 282 (4th Cir. 2009) (in civil conspiracy case, finding no personal jurisdiction in Virginia because no showing of purposeful availment). And, as defendants correctly note, there is no indication that Linglong defendants own any property in Virginia or that their managing agents have ever set foot inside the Commonwealth.

Nonetheless, the evidence was plainly sufficient to prove that Linglong defendants in China participated in the conspiracy knowing that Vance would perform acts in furtherance of the conspiracy in Virginia and indeed, the evidence further showed that Linglong defendants collaborated directly with Vance to commit these acts in Virginia. Specifically, the evidence showed that Linglong defendants worked closely with Vance via e-mail and telephone while Vance was at his home office in Tazewell, Virginia. Vance's e-mail communications reflect that he collaborated with Merry Wang and Linglong defendants' engineering department in

performing some of the work of modifying the Alpha tire blueprints so that they "would not look like the AA (Awful Alpha)" from his home office in Tazewell, Virginia, and additionally, Vance told Wang that he was working on the blueprints from Tazewell.[19]  As another court in this district has held, joining a conspiracy with the knowledge that acts in furtherance of the conspiracy would occur in Virginia constitutes purposeful availment of the privileges of the Commonwealth and thus satisfies the Virginia long-arm statute and constitutional due process requirements. *See Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 539 (E.D. Va. 2009); *see also Consulting Eng'rs Corp.*, 561 F.3d at 282 (emphasizing location of acts in furtherance of conspiracy in determining whether personal jurisdiction existed over co-conspirators). The evidence in this case was plainly sufficient to show that Linglong defendants purposefully availed themselves of the benefits and protections of the Commonwealth through their participation in the conspiracy here in issue and accordingly, the motion must be denied on the personal jurisdiction issue.

C. Conversion Claim

Defendants argue that they are entitled to judgment as a matter of law on the conversion claim. First, they contend that plaintiffs did not prove that they had a right to possess the allegedly converted blueprints or that defendants deprived plaintiffs of possession of their blueprints. This argument too would impermissibly require resolving a genuine factual dispute in favor of defendants, as the evidence adduced at trial was sufficient to allow a reasonable jury to conclude that defendants unlawfully obtained or retained copies of plaintiffs' Alpha tire

---

[19] Pl. Ex. 100.

-10-

blueprints. In other words, the evidence was sufficient to prove (i) that defendants unlawfully

obtained copies of plaintiffs' blueprints, and (ii) that defendants' possession of these blueprints

deprived plaintiffs of the right to control the possession and dissemination of the blueprints and

thereby caused plaintiffs harm. The mere fact that defendants may not have converted the *only*

copy of these blueprints does not somehow negate the deprivation to plaintiffs or render the

converted object "intangible."

For essentially the same reason, defendants' argument that the conversion claim is

preempted by the Copyright Act is unavailing. In *U.S. ex rel. Berge v. Board of Trustees of the*

*Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997), the Fourth Circuit held that the Copyright Act

preempted a conversion claim where the plaintiff did not show that the defendant unlawfully

retained possession of a physical embodiment of the plaintiff's work. Specifically, a doctoral

candidate accused a professor of using the research data she compiled and submitted in

connection with her doctoral thesis to create an unauthorized work claiming the research as his

own. Accordingly, she sued the University for conversion under Alabama law. The Fourth

Circuit held that a "conversion of intellectual property" claim was preempted because the

plaintiff did not prove that the professor "unlawfully retained the physical object embodying

plaintiffs' work," but rather only that he used the ideas and information contained therein. *Id.*

The opinion makes it pellucidly clear that a conversion claim in which the plaintiff *does* allege

unlawful retention of the physical embodiment of the work would *not* be preempted by the

Copyright Act. This is precisely such a case. Plaintiffs allege that Vance "took" the blueprints

without authorization, and the evidence clearly shows precisely as much: that he took plaintiffs'

-11-

tire blueprints without authorization and unlawfully retained them, all the while using them to create the unauthorized Infinity tire blueprints. Accordingly, a straightforward application of *Berge* shows that the conversion claim is not preempted.

Finally, defendants argue that plaintiffs have not presented evidence regarding the fair market value of the converted property at the time of conversion, which is the proper measure of damages for conversion under Virginia law. *See Staley v. Fisher*, 10 S.E.2d 551, 553–54 (Va. 1940). Indeed, it is true that plaintiffs' damages evidence was based on the ultimate value of the converted blueprints—namely, the profits earned from use of the blueprints—and not the value at the time of the conversion. But Fishman testified that the value of the blueprints was essentially equivalent to the value of his business, and plaintiffs' damages expert, Philip Nelson, testified that the ultimate value of the blueprints to defendants was approximately $36 million. And, the evidence showed that the parties understood the potential value of commercial exploitation of the blueprints at the time of the alleged conversion, and thus the fair market value of the blueprints at the time would have reflected this future value. The jury therefore could have reasonably concluded that the fair market value of the blueprints at the time of the alleged conversion included the full amount of profits ultimately earned by defendants from their use. Accordingly, the motion must be denied on the conversion count.

D. Civil Conspiracy Claim

Defendants argue that plaintiffs have failed to adduce sufficient evidence of an unlawful object of the conspiracy, an agreement by the parties, one or more acts in furtherance of the conspiracy, or that any damages were suffered as a result of the conspiracy. To the contrary, the

evidence of each of these objects was ample. Indeed, the trial record strongly indicated that Al Dobowi defendants, Linglong defendants, and Vance—before Al Dobowi defendants hired Vance—agreed to convert plaintiffs' property and to infringe on their intellectual property rights. Moreover, the evidence showed that these agreements more likely than not were entered into inside the United States, with Al Dobowi defendants and Vance joining the conspiracy in the Richmond meeting, and Linglong defendants subsequently joining through e-mail and telephone correspondence with Vance while Vance was in Tazewell, Virginia, and knowing that Vance would commit acts in furtherance of the conspiracy from Tazewell. And finally, the harm to plaintiffs was clearly shown by the expert testimony about the profits that plaintiffs would have earned, but that defendants instead earned as a result of the conspiracy.

Additionally, defendants contend that the conspiracy claim is preempted by the Copyright Act. This contention is plainly meritless, as the conspiracy claim alleged conversion and trademark infringement as objects in addition to copyright infringement, and thus the rights involved were not equivalent to those listed in § 106 of the Copyright Act. *See* 17 U.S.C. § 301; *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993) (explaining equivalence test to determine preemptive effect of Copyright Act on state law claim). Moreover, even a conspiracy claim only alleging an object of copyright infringement would not be preempted, as the gravamen of a conspiracy claim is agreement, not reproduction. *See id.* (holding that whether state law claim is preempted depends on whether the claim goes "beyond mere reproduction or the like").

E. Copyright Claim

-13-

Defendants argue that judgment in their favor is appropriate on the copyright infringement claim for two reasons. The first, and more substantial, argument is that all of the non-time-barred infringing acts occurred outside the United States and are therefore beyond the extraterritorial reach of the Copyright Act. The evidence plainly was sufficient to prove that Vance committed infringing acts inside the United States. Specifically, the evidence showed that during 2005 and early 2006, Vance copied plaintiffs' Alpha tire blueprints and modified them to create an infringing derivative work—the Infinity tire blueprints. Yet, there was little or no evidence that Vance continued to commit these infringing acts inside the United States after October 28, 2006, the critical limitations date for the copyright infringement claim.[20]  Instead, using the infringing derivative Infinity blueprints devised by Vance in Tazewell, Virginia, Linglong defendants produced tire molds and tires in China, and these tires were then sold to various customers. There was no evidence that any of these customers were located inside the United States. Thus, the question, not yet resolved in this circuit, is whether extraterritorial exploitation of a copyright originally infringed inside the United States falls within the jurisdiction of the Copyright Act even though the domestic predicate infringing act occurred prior to the critical limitations date.

The Second and Ninth Circuits have sensibly held that a copyright infringement plaintiff may only recover damages for extraterritorial conduct if the plaintiff pleads and proves "an act of

---

[20] The only evidence that Vance may have committed infringing acts after October 2006 is an e-mail dated March 22, 2006, in which Vance suggests that he will continue to sell tires in the United States after his move to China is complete. There is no evidence that he actually did so, nor that any infringing tires were ever sold in the United States. Pl. Ex. 177.

infringement within the United States." *Subafilms, Ltd. v. MGM-Pathe Comms. Co.*, 24 F.3d

1088, 1094; *see Update Art, Inc. v. Modiin Pubs., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). In

*Update Art*, the Second Circuit squarely held that a plaintiff may recover for a foreign act of

infringement where that foreign act "depends on the occurrence of a predicate act [of

infringement] in the United States." 843 F.2d at 73. Thus, the Second Circuit panel concluded

that because the original act of illegal reproduction of a poster may have occurred in the United

States before the illegal copy was exported to Israel and reprinted in a newspaper, the plaintiff

had stated a valid *prima facie* claim for copyright infringement by the Israel newspaper. *Id.*

Contrary to defendants' assertions, this predicate-act doctrine has not been repudiated in the

Ninth Circuit nor anywhere else.[21]  Indeed, the Second Circuit's rule strikes the proper balance by

ensuring that domestic copyright infringers may not seek refuge for their acts of infringement

within the United States by exploiting those infringing acts in foreign countries. Thus,

application of the Second Circuit's rule yields the result that plaintiffs may recover for

extraterritorial infringing acts that occurred within the three-year limitations period, as plaintiffs

have also adequately proven that a predicate infringing act occurred within the United States.

That the predicate act occurred outside the limitations period is ultimately irrelevant as plaintiffs

---

[21] Indeed, the Ninth Circuit appeared to recognize the validity of *Update Art*, but refused to extend the doctrine to cases in which actual damages—rather than disgorgement of profits—was sought, on the theory, first explained by Judge Hand in *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), that overseas profits resulting from infringement are held by the infringer in a constructive trust for the copyright owner. *See Los Angeles News Service v. Reuters Television Int'l (USA) Ltd.*, 340 F.3d 926, 928 (9th Cir. 2003). As plaintiffs here sought and recovered defendants' profits, and not actual damages, the distinction made by the Ninth Circuit in *L.A. News Service* does not apply.

do not seek to recover for that specific infringing act, and it is well settled that the Copyright

Act's statute of limitations is a limit on the remedy only, and not on the substantive right.[22]

Defendants also argue that the plaintiffs have failed to prove the elements of a copyright

infringement claim. The first argument, that plaintiffs did not present the actual drawings

stamped by the United States Copyright Office, is entirely unavailing. Defendants do not and

cannot identify a single case suggesting that plaintiffs are required to show a Copyright Office

stamp in order to establish ownership when they instead provided registration certificates that

describe the drawings in issue. Indeed, as plaintiffs note, the District Court for the District of

Maryland correctly rejected this precise argument earlier this month. *See Thomas v. Artino*, 2010

WL 2696639, at *5 (D. Md. July 6, 2010).

Next, defendants contend that plaintiffs failed to prove that the drawings are original. To

the contrary, ample evidence was presented that the blueprints in issue survive the threshold

originality requirements, as described in *Feist Pubs., Inc. v. Rural Telephone Serv. Co.*, 499 U.S.

340, 346 (1991), with room to spare. Specifically, the ample evidence of the distinctive

appearance of the tires as depicted in the blueprints clearly demonstrates the "minimal degree of

creativity" required to establish copyrightable originality. *Id.* Indeed, Canning acknowledged the

uniqueness of the tires as depicted in the blueprints when he remarked, in an e-mail message to

Vance and the Kandharis upon receiving a fax from Vance containing blueprints of the proposed

---

[22] *See Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d
1287, 1320 (11th Cir. 2008); *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340 (5th Cir.
1971) (analyzing Copyright Act statute of limitations's legislative history and concluding that
drafters intended limitation to "affect the remedy only, not the substantive right").

Infinity Mining tires, that "we all want to be certain that not only will the tyre perform better than the Alpha but will look as good. . . . We need to see the drawings of the sidewall before we commit ourselves to manufacturing molds. I understand we can't copy exactly what Jordan has done but as I said the tyre has to look the part."[23] Thus, plaintiffs adduced adequate evidence to create a jury issue on the threshold copyright requirements. Accordingly, judgment for defendants on the copyright claim is not appropriate.

F. Trademark and Unfair Competition Claims

Defendants also contend that plaintiffs have failed to satisfy their burden on the registered trademark and unfair competition claims. In the registered trademark claim, plaintiffs attempted to show that defendants' use of "Mine Handler" and "M.M." was a "colorable imitation" of their previously-registered "Mine Mauler" mark that created a likelihood of confusion among consumers. 15 U.S.C. § 1114. On this registered trademark, plaintiffs have not shown that defendants' use of "Mine Handler" or "M.M." created a likelihood of confusion as to source. This is so because, in the context of mining tires, "Mine Mauler" is simply not similar to either of defendants' marks. "Handler" and "Mauler" are different words that do not look or sound the same, and nor do they conjure up the same symbolic impression in the mind of a consumer. And, plaintiffs did not establish that they ever used "M.M." as an acronym for the Mine Mauler mark *in commerce.*[24] Thus, the marks are so dissimilar that there was no jury issue on whether there

---

[23] Pl. Ex. 25.

[24] Fishman merely testified that he occasionally used "M.M." as shorthand for "Mine Mauler" when he did not have space to write the full mark out. There was no evidence that plaintiffs have ever used "M.M." as a trade name or otherwise to describe their products to the consuming public.

was a likelihood of confusion under the established Fourth Circuit test. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).

Plaintiffs emphasize what they call evidence of actual confusion, namely Vance's diversion of an order for Alpha tires to defendants. The original order form was for a "Mine Mauler" tire and was addressed to Alpha Mining Systems, a trade name under which plaintiffs were doing business. By e-mail, Vance diverted the business by informing the customer that the "name of the company is now Tyrex International LTD.," and not Alpha Mining Systems, and that the "name on the tyre is Mine Handler, not Mine Mauler."[25] The customer made the requested changes and re-submitted the order form to Vance.

Although this exchange shows that Vance diverted an order from plaintiffs to defendants, it does not show actual confusion over the source of the tires *resulting from the similarity of the marks*. The fact that the customer apparently believed that the name of the tire was changed from Mine Mauler to Mine Handler is not evidence that the two marks are confusingly similar; under that rationale, one would also have to conclude that "Alpha Mining Systems" and "Tyrex International LTD." are confusingly similar, and they clearly are not. Thus, plaintiffs' purported evidence of actual confusion does not prove, as required, that the similarity of the marks caused actual confusion. Accordingly, it did not create a jury issue on this issue, and defendants are entitled to judgment as a matter of law on the registered trademark claim.

With respect to the unregistered marks, defendants also argue that plaintiffs failed to demonstrate the distinctiveness of the marks or the likelihood of confusion between defendants'

---

[25] Pl. Ex. 130.

marks and plaintiffs' marks.  Notwithstanding these claims, plaintiffs have demonstrated the required elements of an unfair competition claim with respect to at least two of the unregistered marks: "L-6T" and "Δ Recap."  As described in the recitation of facts above, the evidence reflected that the "L-6T" mark has no fixed meaning in the tire industry and is merely suggestive of a tire with deep tread.  And the evidenec was disputed as to whether the use of the triangle in the "Δ Recap" mark was arbitrary, or whether it reflected a common industry practice.  Thus, the jury reasonably could have concluded that it was, in fact, arbitrary.  And, with respect to similarity, defendants copied these marks verbatim on their tires.  The precise identity of the marks, together with defendants' stated goal of creating confusion as to source, satisfies the threshold requirements of an unfair competition claim.  Thus, plaintiffs' adduced sufficient evidence to create a jury issue on the unfair competition claims at least with respect to two of the unregistered marks, and thus judgment as a matter of law on this claim is not appropriate.

Defendants also contend that the claims allege only extraterritorial activity and thus fall outside the scope of the federal Lanham Act.  Contrary to this contention, plaintiffs adduced ample evidence that defendants' infringing activity succeeded in destroying a business based in the United States through acts that occurred partly within the United States.  And moreover, the record amply reflected that defendants clearly intended to sell their infringing tires in the United States, even if this plan never ultimately came to fruition.  This was sufficient evidence for the jury reasonably to conclude that defendants' conduct had substantial effects on United States commerce.  Moreover, it is worth noting that the cases cited by defendants are principally concerned with whether Lanham Act injunctions should be granted with respect to extraterritorial

-19-

conduct. As no such injunctive relief was requested, or granted, here, the concerns about extraterritorial application, while always present, are less significant here. *See Nintendo of Am., Inc. v. Aeropower Co. Ltd.*, 34 F.3d 246 (4th Cir. 1994) (reversing Lanham Act injunction on extraterritoriality grounds).

## G. Damages

For the first time in their renewed motion, defendants argue that there was no reasonable basis for the jury's $26,000,000 verdict in this case because plaintiffs' damages expert, Dr. Philip Nelson, improperly considered infringing activity occurring outside the applicable limitations periods. This argument is meritless as, contrary to defendants' contention that the jury awarded the full amount requested by plaintiffs, it appears that the jury reduced the award by over 25 percent from plaintiffs' request, and this reduction appears to correlate to the percentage of infringing sales that likely occurred outside the copyright infringement limitations period. And moreover, the conversion claim is subject to a five-year statute of limitations that brings within its ambit all of defendants' profitmaking from the alleged conversion, and thus the jury reasonably could have awarded plaintiffs the full $36 million requested. But in any event, this issue need not be reached nor decided here, for defendants' argument about Dr. Nelson's testimony is nowhere to be found in their detailed preverdict Rule 50(a) motion. And, it is hornbook law that a Rule 50(b) "movant cannot assert a ground that was not included in the earlier motion." Charles Wright & Arthur Miller et al., *Fed. Practice & Procedure* § 2537 (3d ed.) (citing, *inter alia, Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2617 (2008)). Thus, because this argument about the purpoted deficiency of Dr. Nelson's testimony was not raised in

-20-

the previous motion, it cannot be "renewed" and ruled on here.  Accordingly, the motion is denied in this respect.

**IV.**

In sum, defendants are entitled to judgment as a matter of law (i) with respect to Surender Kandhari and (ii) on plaintiffs' registered trademark claim.  As there was a sufficient evidentiary basis for the jury reasonably to find for plaintiffs on all other issues, the motion must be denied in all other respects.

Accordingly, and for good cause,

It is hereby **ORDERED** that defendants' motion for judgment as a matter of law (Docket Nos. 247 & 255) is **GRANTED IN PART** insofar as (i) defendant Surender Kandhari is **DISMISSED** from the case, and (ii) plaintiffs' registered trademark infringement claim is **DISMISSED**, and **DENIED IN ALL OTHER RESPECTS.**

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
July 21, 2010

/s/
T. S. Ellis, III
United States District Judge