F I L E D

OCT I 8 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

IN RE: OUTSIDEWALL TIRE       )        Case No. 1:09cv1217
LITIGATION                    )

## <u>MEMORANDUM OPINION</u>

At issue post-verdict in these closely-related consolidated[1] international business tort

cases is plaintiffs' petition for attorneys' fees[2] following a jury verdict in favor of plaintiffs on

claims for copyright infringement, unfair competition and deceptive trade practices,[3] conversion,

and civil conspiracy.

## I.

Plaintiffs in this consolidated case are (i) Jordan Fishman, a Florida citizen, and three

companies he owns and controls: (ii) Tire Engineering & Distribution LLC ("TED"), a Florida

company, (iii) Bearcat Tire ARL, LLC ("Bearcat"), also a Florida company, and (iv) Bcatco

A.R.L., Inc. ("Bcatco"), which is incorporated under the laws of the Jersey Channel Islands.

During times relevant to this litigation, plaintiffs were in the business of designing,

manufacturing, and marketing rubber tires for use on underground mining vehicles.

There are two sets of defendants. The first set, collectively referred to as "Al Dobowi

defendants," consists of (i) Al Dobowi, Ltd., (ii) Al Dobowi Tyre Co., LLC, (iii) TyreX

---

[1] *See In re Outsidewall Tire Litigation*, No. 1:09cv1217 (E.D. Va. April 16, 2010) (Order)
(consolidating the cases for trial).

[2] Plaintiffs' petition for costs will be resolved by a separate order.

[3] Plaintiffs brought claims for unfair competition based on infringement of plaintiffs'
unregistered trade marks as well as their registered trademarks. Although the jury reached a
verdict in favor of plaintiffs on both types of marks, the claims were dismissed as to plaintiffs'
registered marks on defendants' Rule 50(b) motion. *See In re Outsidewall Tire Litigation*, No.
1:09cv1217 (E.D. Va. July 21, 2010) (Order).

International, Ltd., and (iv) TyreX International Rubber Co., Ltd., all of which are corporations based in the United Arab Emirates and owned by Surender Kandhari,[4] a citizen of Dubai. The second set of defendants, collectively known as "Linglong defendants," includes (v) Shandong Linglong Rubber Co., Ltd. and (vi) Shandong Linglong Tire Co., Ltd., both of which are incorporated and based in China. All defendants are, inter alia, in the business of designing, manufacturing, and/or marketing rubber tires.

The central allegations in this matter were that defendants designed, manufactured, and sold specialized mining tires based on mining tires originally designed and sold by plaintiffs and protected by plaintiffs' intellectual property rights. Plaintiffs originally brought the following counts against defendants: (i) violation of the Virginia business conspiracy statute (Va. Code § 18.2-499); (ii) common law civil conspiracy; (iii) tortious interference with business relations; (iv) misappropriation of trade secrets; (v) copyright infringement; (vi) trademark infringement based on plaintiffs' registered mark, "Mine Mauler"; (vii) unfair competition and deceptive trade practices based on misappropriation of eleven unregistered marks[5]; (viii) conversion; and (ix) unjust enrichment. The initial pretrial conference was held on February 3, 2010. Discovery lasted until June 23, 2010 and was far from free of dispute. Indeed, during discovery, the parties brought a total of six motions to compel—four by plaintiffs and two by defendants—with mixed

---

[4] Although he was originally named as an individual defendant, Surender Kandhari was dismissed from the case because plaintiffs agreed they never served Surender Kandhari in his individual capacity. *In re Outsidewall Tire Litigation*, No. 1:09cv1217 (E.D. Va. July 21, 2010) (Order).

[5] Plaintiffs based this count on the marks "M.M.," "L-6T," "L-6T+," "EDT," "Δ Recap," "1425x450-25," "1425x450-34," "57x2800-27," "57x2500-27," "48x2500-25.1," "1320x355-23."

results.[6] On June 29, 2010, defendants were granted summary judgment as to Counts I, III, IV, and IX based on the applicable statutes of limitations. Plaintiffs proceeded to jury trial on the remaining four counts of their complaint.

During the six-day trial, plaintiffs presented live and videotaped testimony from several witnesses, including (i) Sam Vance, plaintiffs' former employee and an alleged employee of Al Dobowi defendants; (ii) Surender, Harjeev, and Jasjeev Kandhari, who together operate the Al Dobowi defendant entities; (iii) John Canning, a tire design consultant to Al Dobowi defendants with personal knowledge of the alleged conspiracy; and (iv) Merry Wang, an executive with Linglong defendants. Plaintiffs also presented documentary evidence, including e-mail exchanges among the alleged co-conspirators admitted pursuant to Rule 801(d)(2)(E), Fed. R. Evid. Defendants presented live testimony from Jasjeev Kandhari, a director of the Al Dobowi entities, and Merry Wang, a marketing director with Shandong Linglong Tire Co. The parties also presented competing expert witnesses on the issues of infringement and damages.[7]

The evidence adduced at trial was sufficient to allow a reasonable juror to conclude by the requisite standard of proof as follows:

- In the first week of May 2005, Surender Kandhari and John Canning, both representing one or more Al Dobowi defendants, met with Sam Vance in the lobby of the Jefferson Hotel in Richmond, Virginia.[8] During this hour-long meeting, Vance, Canning, and Surender Kandhari discussed the possibility of Al Dobowi defendants—which had never

---

[6] Two of plaintiffs' motions to compel were granted (Doc. Nos. 55 & 58), one was denied on the merits (Doc. No. 147), and one was denied as moot (Doc. No. 112). Of defendants' two motions to compel, one was granted in part and denied in part (Doc. No. 91), and the other was denied as moot (Doc. No. 48).

[7] Prior to trial, plaintiffs challenged two of defendants' expert witnesses based on defendants' alleged failure to disclose fully the experts' opinions pursuant to Rule 26(a)(2), Fed. R. Civ. P. (Doc. Nos. 236 & 241). Defendants for their part challenged plaintiffs' expert witness on various substantive grounds. (Doc. No. 173). None of these motions was successful.

[8] Tr. July 8, 2010, at 532 (testimony of John Canning).

before manufactured or sold mining tires—producing a line of mining tires based on plaintiffs' line of mining tires, known as "Alpha tires."[9]

- Vance apparently retained blueprints belonging to plaintiffs without plaintiffs' permission even though a warning on the drawings indicated that they were confidential, and that reproduction or other use must be expressly authorized in writing.[10]

- By September 2005, Vance was working with Linglong defendants to adapt the Alpha tire blueprints into drawings for Al Dobowi defendants' new "Infinity Mining tires" series. Vance indicated in a contemporaneous e-mail to Merry Wang that he was working "on the 2 drawings."[11]  In this e-mail message dated September 1, 2005, Vance sought to confirm that Linglong defendants' engineering department was "working on the reccommendations [sic] for the changes to the drawings" to ensure that "our Infinity Mining tires would not look like the AA (Awful Alpha) Ha!"[12]

- In a September 8, 2005 e-mail from Canning to Vance, to which the three Kandharis were copied, Canning asked Vance a series of questions about Vance's proposed drawings, noting: "I understand we can't copy exactly what Jordan [Fishman] has done but as I said the tyre has to look the part."[13]

- Vance, Canning, and Linglong defendants proceeded to design new tire blueprints and molds based on the Alpha tire blueprints, despite having ample notice—including several communications from plaintiff Jordan Fishman—that the blueprints contained protected intellectual property. Indeed, in a September 22, 2006 e-mail from Vance to Sean DeCosta, an Al Dobowi sales manager, Vance notes: "Please remember we copied existing products in the field."[14]

- Additionally, the Infinity Tire's sidewall also contains the marking "L-6T", a marking that also appears on Alpha tires. As Vance acknowledged in an e-mail message to a Linglong employee, the L-6T mark suggests a tire with significant tread depth, but the mark itself has no technical meaning; to the contrary, "this was only a marketing thing."[15]

---

[9] Id. at 533–36.

[10] Pls. Ex. 153.

[11] Pls. Ex. 103 (e-mail from Vance to Merry Wang). The e-mail says 'Na.' and not 'Va.', but Vance acknowledged in his videotaped testimony that this was a typographical error and that he was, in fact, referring to his home in Virginia. See Tr. July 8, 2010, at 697 (testimony of Vance).

[12] Pls. Ex. 103.

[13] Pls. Ex. 25.

[14] Pls. Ex. 26.

[15] Pls. Ex. 36.

The Tyre & Rim Association standards for tread depth measurement range from L-1 to L-5; an Alpha tire branded as L-6T had an L-5 tread depth rating. In the September 2006 e-mail to DeCosta, Vance notes: "The brand copied used a marketing stratigy [sic] of L-6 to give the impression of having the most tread depth. So as not to give the imression [sic] of having less we copied the L-6 T strategy."[16] This message strongly indicates that defendants chose to use the L-6T mark on the basis of the meaning that plaintiffs' use of the L-6T mark had acquired in the industry.

- Both the Alpha tires and the Infinity tires carried the mark "Δ Recap." There was disputed evidence as to whether the "Δ" mark is arbitrary, or whether it is in fact commonly used on tires to indicate the point at which a tire needs to be retreaded.[17]

- On more than one occasion, Vance and/or family members of Al Dobowi stated that they were not concerned about liability for infringing Fishman's designs because they "didn't believe Jordan Fishman would ever get his case to court [because] he would die or run out of money first."[18]

On July 15, 2010, the jury found in favor of plaintiffs on all counts. On July 20, defendants moved for judgment as a matter of law pursuant to Rule 50(b), Fed. R. Civ. P. The motion was granted in part and denied in part. *See In re Outsidewall Tire Litigation*, No. 1:09cv1217 (E.D. Va. July 21, 2010) (Order).[19] As indicated in the July 21 Order, the evidence presented at trial was sufficient to show infringement of at least two of the eleven unregistered marks, namely the marks "L-6T" and "Δ Recap." Accordingly, the jury's verdict on the unfair competition claim under the § 43 of the Lanham Act, 15 U.S.C. § 1125(a), was sustained in this regard. The verdict was also sustained with respect to the copyright, common law conspiracy, and conversion claims. Yet, defendants were granted judgment as a matter of law with respect to the registered trademark claims because the evidence was insufficient to show a likelihood of

---

[16] Pls. Ex. 26.

[17] Tr. July 7, 2010, at 233–34 (testimony of Jordan Fishman); Tr. July 13, 2010, at 1177 (testimony of Mark Mineur).

[18] Tr. July 8, 2010, at 627 (testimony of Canning).

[19] Prior to the verdict, defendants' filed a timely motion for judgment as a matter of law pursuant to Rule 50(a), Fed. R. Civ. P, which was taken under advisement.

confusion on the "Mine Mauler" mark. In the end, therefore, although eleven unregistered marks and one registered mark were presented to the jury on the question of trademark infringement, only two unregistered trademark claims survived defendants' post-trial Rule 50(b) motion.[20]  *Id.*

## II.

The first issue on plaintiffs' motion for fees is whether they are entitled to fees based on the nature of their claims. Plaintiffs correctly concede that only their claims under the Lanham Act provide a colorable basis for fees. The Lanham Act permits the award of "reasonable attorney fees to the prevailing party" only in "exceptional cases." 15 U.S.C. § 1117(a); *see also Retail Servs. v. Freebies Publ'g*, 364 F.3d 535, 550 (4th Cir. 2004).

The threshold question presented, then, is whether the record reflects that with respect to the Lanham Act claims, this is an "exceptional" case. In the Fourth Circuit, a Lanham Act case is considered "exceptional" where a defendant's conduct was "malicious, fraudulent, willful or deliberate in nature." *Retail Servs.*, 364 F.3d at 550 (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001)). That is, a prevailing plaintiff in a Lanham Act case must show that the defendant acted "in bad faith." *Id.* And importantly, the prevailing party bears the burden of demonstrating the exceptional nature of the case by clear and convincing evidence. *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 491 (5th Cir. 2008); *Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992); *Synthon IP, Inc. v. Pfizer, Inc.*, 484 F. Supp. 2d 437, 441 (E.D. Va. 2007); *Thomas & Betts Power Solutions, L.L.C. v. Power Distrib.*, 2008 U.S. Dist. LEXIS 9493 (E.D. Va. Feb. 8, 2008). It is also important to note that

---

[20] Defendant Surender Kandhari was also dismissed from the case as an individual defendant because he was not served in an individual capacity. *In re Outsidewall Tire Litigation*, No. 1:09cv1217 (E.D. Va. July 21, 2010) (Order).

6

"willfulness" means more than simply that the act of infringement was "done voluntarily and intentionally and not because of accident or other innocent reason." *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir. 1992) (noting that such a minimal interpretation of willfulness "falls far short of the kind of culpability required to render a case 'exceptional'").

Here, the trial record clearly and convincingly demonstrates that the Al Dobowi defendants' conduct was malicious, willful, and deliberate in nature, but the same cannot be said for the conduct of Linglong defendants. As such, plaintiffs are entitled to collect reasonable attorneys' fees in connection with their Lanham Act claims against Al Dobowi defendants, but they are not entitled to any attorneys' fees from Linglong defendants.

As to Al Dobowi defendants, the tires they ordered from Linglong and sold not only incorporated the functional aspects of Fishman's design, but in Canning's words, they were also made "to look the part."[21] To achieve this purpose, Al Dobowi defendants deliberately incorporated the trademarks from Fishman's tires. For example, when employees at Al Dobowi questioned why the tire designs incorporated the marks "L6-T" and "Δ Recap", Vance explained that the marks were deliberately copied from plaintiff's Alpha tires. The evidence leaves no question that Al Dobowi defendants knew, and indeed intended, that these marks would create confusion with plaintiffs' marks. Rather than license or otherwise partner with plaintiffs to legitimize defendants' tires, Al Dobowi defendants willfully exploited the marks for their benefit. Despite being aware that they were infringing on plaintiffs' marks, Al Dobowi defendants decided to continue to infringe and thought they did so with impunity because, in the words of Canning, Vance and the Al Dobowi family members did not believe "Jordan Fishman

---

[21] Pls. Ex. 25.

would ever get his case to court [because] he would die or run out of money first."[22]  In short, with respect to the conduct of Al Dobowi defendants, plaintiffs have met their burden of establishing an exceptional case by clear and convincing evidence.

This result is consistent with *Employers Council on Flexible Compensation v. Feltman,* 2010 U.S. App. LEXIS 12688 (4th Cir. June 21, 2010), in which the Fourth Circuit affirmed an award of attorneys' fees to a successful Lanham Act trademark plaintiff based on the district court's finding that the case was exceptional.  There, the plaintiff, a nonprofit lobbying organization identified as "Employers Council on Flexible Compensation" (ECFC), was incorporated in 1981 in the District of Columbia.  In providing services, ECFC used three trademarks: (i) its full name, "Employers Council on Flexible Compensation"; (ii) the acronym "ecfc"; and (iii) an "ecfc" logo.  *Id.* at *2-8.  In 1996, financial problems led ECFC's executive director to create a separate management company, Radnor, Inc. ("Radnor"), led by defendant Feltman, to assume the day-to-day operations of ECFC.  In time, business disputes between ECFC and Radnor led to arbitration proceedings in 2007.  During those proceedings, Radnor's counsel discovered that ECFC's corporate charter had been revoked, and he wrongly concluded that ECFC had forfeited its trademarks.  Radnor's counsel shared this information with Feltman, at which point Radnor's counsel and Feltman incorporated a for-profit company in D.C. under the name "Employers Council on Flexible Compensation."  They also registered various trademarks based on this name despite the fact that plaintiff ECFC was still operating under the name "Employers Council on Flexible Compensation."  ECFC sued Feltman and related defendants for, *inter alia,* infringement of unregistered trademarks in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  On these facts, the Fourth Circuit affirmed the district court's

---

[22] Tr. July 8, 2010, at 627 (testimony of Canning).

award of attorneys' fees, finding an "exceptional" case for the purposes of 15 U.S.C. § 1117(a). *Id.* at *16-18. In particular, the court noted that defendants saw ECFC's charter revocation as "an opportunity [for Feltman to] retrieve his business by competing directly against ECFC" after ECFC had wronged him by terminating its relationship with Radnor in 2005. *Id.* (alteration in original). In the end, the court rejected defendants' argument that they "in good faith believed that ECFC had abandoned any rights it had in that name," because "ample evidence" showed that the attorney researching the issue had done only cursory legal research. *Id.*

Here, just as in *Felton*, Al Dobowi defendants were well aware that their tires' marks infringed on plaintiffs' marks, and indeed, infringement was their goal. Al Dobowi defendants apparently believed they would avoid legal consequences for their actions because, in their view, Fishman would not have the stomach for lengthy and costly litigation—a theory that proved to be quite wrong. As in *Felton*, Al Dobowi defendants acted willfully and deliberately and for the purposes of capitalizing on the value of plaintiffs' marks.

Additionally, the case at bar is distinguishable from that of *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001), where the court affirmed the denial of attorneys' fees to People for the Ethical Treatment of Animals ("PETA") after PETA succeeded on its Lanham Act trademark claims against the owner of a parody website, "People Eating Tasty Animals." *Id.* at 370. Although the defendant had acted in bad faith by registering the domain www.peta.org for his website,[23] his subjective belief that he had a "a legitimate First Amendment right to express himself . . . and to create a parody of the plaintiff's organization"

---

[23] The district court found that the defendant acted in bad faith in registering of www.peta.org under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C.A. § 1125(d). But as the Fourth Circuit noted later in *Retail Services*, "the bad faith showing required for a violation of the ACPA is not alone sufficient to establish the maliciousness or willfulness necessary to recover attorney fees" under the Lanham Act. 364 F.3d at 551 n.6 (citation omitted).

negated a finding of malicious, fraudulent, willful or deliberate intent. *Id.* The facts here, by contrast, demonstrate that Al Dobowi defendants' deliberately infringed plaintiffs' marks to profit from the consumer confusion that would result. Accordingly, consistent with the principles enumerated in *Felton* and *People for the Ethical Treatment of Animals*, it is appropriate to award plaintiffs reasonable attorneys' fees with respect to the Lanham Act claims against Al Dobowi defendants.

The Linglong defendants' conduct is clearly distinguishable from that of the Al Dobowi defendants. Importantly, the statement most telling of the Al Dobowi's contempt toward plaintiffs' intellectual property rights—that they "didn't believe Jordan Fishman would ever get his case to court [because] he would die or run out of money first"—was not made to, or in the presence of, any Linglong personnel. Additionally, the roles of the Linglong defendants differed from the roles of the Al Dobowi defendants in that Linglong defendants manufactured the infringing tires based on the directions of Al Dobowi defendants. In other words, while Linglong defendants played an important role in the infringement scheme, Al Dobowi defendants initiated and spearheaded the operation. It is true that all defendants were on notice that their conduct infringed on plaintiffs' marks, but this fact alone is not dispositive of whether their conduct was malicious, fraudulent, willful, or deliberate in nature. *See Texas Pig Stands*, 951 F.2d at 697 ("exceptional case" standard "require[s] a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud"). Because it cannot be shown by clear and convincing evidence that Linglong defendants' conduct was malicious, fraudulent, willful or deliberate in nature, plaintiffs are not entitled to collect attorneys' fees from those defendants.

10

## III.

Given that plaintiffs are entitled to collect reasonable attorneys' fees from the Al Dobowi defendants in connection with the unfair competition claims, the task at hand is to evaluate plaintiffs' fee petition to set the appropriate fees award. In its petition, plaintiffs request $2,162,567.50 in attorney's fees. Defendants object to plaintiffs' request in numerous respects.

The legal principles dispositive of a fee petition are well-settled. First, the fee applicant bears the burden of establishing by clear and convincing evidence the amount of a reasonable fee in the circumstances. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). In making this calculation, "[t]he most useful starting point" is the lodestar amount, or "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* In this regard, it has long been clear that "[p]roper documentation is the key to ascertaining the number of hours reasonably spent on legal tasks." *See EEOC v. Nutri/System, Inc.*, 685 F. Supp. 568, 573 (E.D. Va. 1988).[24] Courts frequently exercise their discretion to reduce an entire fee request or portions

---

[24] Indeed, fee claimants must submit documentation that reflects "reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity," sufficient to permit the court to weigh the hours claimed and exclude hours that were not "reasonably expended." *EEOC*, 685 F. Supp. at 573 (citing *Hensley*, 461 U.S. at 433). Inadequate documentation includes the practice of grouping, or "lumping," several tasks together under a single entry, without specifying the amount of time spent on each particular task. *See, e.g., In re Great Sweats, Inc.*, 113 B.R. 240, 244 (Bankr. E.D. Va. 1990) (disapproving "lumping" of several tasks under a single entry without specifying the amount of time spent on each task so that no accurate determination of the reasonableness of time expended can be made); *In re WHET, Inc.*, 58 B.R. 278, 280 (Bankr. D. Mass. 1986) (noting that "lumping" of day's activities makes attorneys' records of absolutely no value for any analytical purpose). This and other instances of inadequate documentation prevent an accurate determination of the reasonableness of the time expended in a case and because of this, inadequate documentation is a proper basis for reducing a fee award. That reduction can be accomplished in one of two ways: (i) by identifying and disallowing specific hours that are not adequately documented, or (ii) by reducing the overall fee award by a fixed percentage or amount based on the trial court's familiarity with the case, its complexity, and the counsel involved. *See EEOC*, 685 F. Supp. 568 (citing *Uzzell v. Friday*, 618 F.Supp. 1222, 1226, 1229 (M.D.N.C.1985) (fees reduced 25% for attorneys and 35% for paralegals as a result of inadequate documentation)).

thereof by a stated percentage in order to address some deficiency in the application, such as redundant time entries, failure to exercise billing judgment, or excessive number of hours sought.[25] The determination of a fee award must also be informed by "other considerations that may lead the district court to adjust the fee upward or downward," including the twelve "*Johnson*" factors. *Hensley*, 461 U.S. at 434 (citing *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir.1974)).[26]  Ultimately, "[t]he matter of attorney fees rests, of course, within the sound discretion of the trial judge, who is in the best position to determine whether, . . . [and to what extent], they should be awarded." *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1458 (Fed. Cir. 1984).  And in any event, "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437.

The analysis begins, therefore, with the calculation of a lodestar figure.  Plaintiffs have submitted tables indicating that their attorneys invested a 4,897.6 hours on this case, and they have provided detailed billing logs to support their figures.  Attorney Matteis's affidavit also

---

[25] *See, e.g., Walker v. HUD*, 99 F.3d 761, 770 (5th Cir. 1996) (15% overall reduction to compensate for failure to exercise billing judgment); *Leroy v. City of Houston*, 831 F.2d 576, 586 n.16 (5th Cir.1987) (13% overall reduction based on incomplete time records); *Carr v. The Fort Morgan School District*, 4 F. Supp. 2d 998, 1003 (D. Colo.1998) (15% overall reduction to account for excessive time spent by attorneys with clients, excessive trial preparation, duplicative time entries, and insufficient detail); *Uzzell v. Friday*, 618 F. Supp. 1222, 1226, 1229 (M.D.N.C.1985) (25% reduction of one portion of fees "to eliminate the possibility of duplicative or unreasonable time" and 35% reduction of another portion of fees based on inadequate documentation).

[26] Specifically, the twelve *Johnson* factors are as follows:  (1) the time and labor required to litigate the suit; (2) the novelty and difficulty of the questions presented by the lawsuit; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment opportunities for the attorney due to the attorney's acceptance of the case; (5) the customary fee for such services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case;  (11) the nature and length of the attorneys' professional relationship with the client; and (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.

states that this figure reflects a reduction of $550,148.50 worth of billable hours by the elimination of

> (i) all time entries by non-lawyers; (ii) entries relating specifically to unsuccessful claims including misappropriation of trade secrets; (iii) time spent by newly assigned attorneys getting up to speed on the matter; (iv) travel and recovery time from counsels' trip to Dubai . . . ; (v) non-legal tasks; and (vi) document review.

Matteis Aff. ¶ 10.

Despite plaintiffs' pre-submission reduction of their billable hours, the 4,897.6 hours figure must still be significantly further reduced. As an initial matter, it must be noted that although plaintiffs indicate that they eliminated entries for unsuccessful claims, they still seek fees for work devoted to the litigation as a whole because the work related to a "common core of facts" and because the claims are "so intertwined that it is impossible to differentiate between work done" on matters that were ultimately successful from those that were not. Pls. Br. at 11 n.24 (citing *Hensley*, 461 U.S. at 435; *Gracie v. Gracie*, 217 F.3d 1060, 1069-70 (9th Cir. 2000)). Courts indeed have discretion to award fees for work done on the litigation as a whole, even where certain litigation strategies were not successful, because "[t]he result is what matters." *Hensley*, 461 U.S. at 435; *see also Western Insulation, LP v. Moore*, 362 Fed. Appx. 375, 381 (4th Cir. Va. 2010) ("when a suit involves several claims that have a core of related facts, division of hours between claims can be an exercise in futility"). But in this case, a significant reduction is appropriate because many of the claims for which plaintiffs are not entitled to fees—whether because the claims were unsuccessful or because the claims are not the proper basis for a fee award—involve legal research different from the research for which fees are appropriate. First, of the claims on which plaintiffs were successful, only the Lanham Act claims give rise to a fee award; they are not entitled to fees on the claims for copyright infringement, conversion, and civil conspiracy, all of which are somewhat factually distinct and

involve different legal research from the Lanham Act claims. Second, plaintiffs are not entitled to fees on their Lanham Act claims against Linglong defendants because, with respect to Linglong, those claims fail the "exceptional case" standard, as explained *supra*. As these claims involved a number of different actors than the claims against Al Dobowi defendants, the hours spent on these claims must be reduced. Finally, plaintiffs are not entitled to fees for claims on which they did not prevail, namely the claims dismissed on summary judgment—statutory conspiracy, tortious interference, misappropriation of trade secrets, and unjust enrichment—and the claim for infringement of plaintiffs' registered trademarks, which was dismissed pursuant to defendants' post-trial motion for judgment as a matter of law. Since plaintiffs' own reduction of their fee submission does not sufficiently address these issues, a more significant reduction is appropriate.

The billings logs contain two other deficiencies that warrant a reduction in the fees award. First, as defendants rightly point out in their opposition to the fee petition, Matteis's representation that he struck billing entries related to document review is belied by the log itself, at least insofar as entries for document review comprise more than 100 hours of time on the logs. Second, while not widespread, the logs contain several instances of lumping, such as a 5.4 hour entry on February 6, 2010, labeled "Review documents provided by Fishman, prepare memorandum re key documents, and draft email to K. Kale and A. Matteis highlighting documents and their evidentiary significance," and a 10.5 hour entry on March 5, 2010, labeled "Prepare for and argue motion to amend, call with client, discovery." Reductions are appropriate in light of these deficiencies.

Taking all of these factors into account, including the reductions already made by plaintiffs themselves, it is appropriate to reduce the overall number of hours performed by the

plaintiffs' attorneys by an additional 60%.[27] The total number of hours for which plaintiffs'

counsel are entitled to attorneys' fees, therefore, is 1,959.

The analysis turns next to the reasonableness of the plaintiff's counsel's hourly rates.

The Fourth Circuit has recognized that "[i]n addition to the attorney's own affidavits, the fee

applicant must produce satisfactory specific evidence of the prevailing market rates in the

relevant community for the type of work for which he seeks an award." *Plyler v. Evatt*, 902 F.2d

273, 277 (4th Cir. 1990) (citations and internal quotation marks omitted).  In this regard,

plaintiffs' submissions fall well short of the required evidentiary showing.  Typically, a party

seeking attorneys' fees would present an affidavit from a local counsel not connected to the

present litigation who would offer testimony concerning prevailing local rates for the relevant

type of work. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009).

Plaintiffs did not follow this procedure; instead, they offered the affidavit of one of their own

attorneys who worked on the case, August Matteis, who asserts that the Gilbert LLP rates are

reasonable, and an excerpt from the National Law Journal providing a nationwide sampling of

law firm billing rates.  These exhibits are not clear and convincing evidence of the

reasonableness of the attorneys' rates.  Although Matteis provides some background in his

affidavit on the Gilbert LLP attorneys who participated in this litigation, he fails to provide any

analysis of prevailing market rates in this locality.  Additionally, plaintiffs' citation to the

National Law Journal's survey falls well short of the plaintiffs' burden to show that their

attorneys' rates are consistent with prevailing market rates in this area.  The survey reveals only

the range of rates charged by DC-area law firms—such as noting that Venable LLP's partners

charge between $380 and $950 per hour—with no attention given to the distribution of those

---

[27] *See* n.25 *supra* (citing cases where district courts exercised their discretion to reduce a fee
award by a percentage to address deficiencies in the fee application).

rates. The fact that some outlier attorneys in the DC area may charge close to $1000 per hour does not indicate that the rates charged by Gilbert LLP's attorneys are reasonable. In particular, the rates charged by Scott Gilbert and Craig Litherland, $850 per hour and $750 per hour respectively, are unreasonably high on their face. In any event, the prevailing rates of attorneys in the District of Columbia are higher than the rates of attorneys in Northern Virginia. *Robinson*, 560 F.3d at 245. Courts in this division have previously recognized rates of up to $400 for partners and $250 to $300 for associates working on cases similar to this one. *See e.g.*, *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 2009 U.S. Dist. LEXIS 98742 (E.D. Va. Oct. 16, 2009). Furthermore, this Court's experience is that attorneys' in this locality can perform the work required in this case competently for between $275 and $400 per hour. Because plaintiffs have not carried their burden to show by clear and convincing evidence the reasonableness of the hourly rates proposed for their attorneys, an adjustment of the rates is appropriate. Accordingly, for the purposes of determining the lodestar amount, the following rates have been applied based on the experience of plaintiffs' attorneys: $400 per hour for partners, $350 per hour for counsel, and $275 per hour for associates.

The following table summarizes the hourly rates and the hours worked by each of plaintiffs' attorneys in light of these adjustments:

| Attorney/Employee | Title | Adjusted Hourly Rate | Adjusted Hours Per Timekeeper | Total |
|---|---|---|---|---|
| August Matteis | Partner | $400.00 | 393.9 | $157,560.00 |
| Scott Gilbert | Partner | $400.00 | 7.8 | $3,120.00 |
| Craig Litherland | Partner | $400.00 | 46.5 | $18,600.00 |
| William Copely | Counsel | $350.00 | 501.7 | $175,595.00 |
| Kathleen Hale | Associate | $275.00 | 650.9 | $178,997.50 |
| Aisha Williams | Associate | $275.00 | 358.2 | $98,505.00 |
| | | | | |
| *Grand Total* | | | *1,959* | *$632,377.50* |

As indicated in the above table, the lodestar figure for the plaintiffs' attorneys' fees is $632,377.50.

From here, it remains only to decide whether this figure should be adjusted further based on the twelve *Johnson* factors. *See* 488 F.2d at 717-19. Plaintiffs assert that several *Johnson* factors justify a high attorneys' fees award. First, plaintiffs note that their time and labor on this litigation was extensive. But, as noted, the calculation of the lodestar amount has already taken into account the hours expended on this litigation, and no further adjustment in this regard is necessary. Second, plaintiffs suggest the case presented novel and difficult questions because the defendants were located in China and Dubai. While foreign defendants do complicate the prosecution of a case, these challenges are generally isolated to initial phases of a case, such as service of process and the establishment of jurisdiction. Finally, plaintiffs point to the qualifications of their attorneys as a critical factor in their success. Undoubtedly, plaintiffs' counsel brought the necessary skills and experience to bear on this litigation, but these skills are consistent with what one would expect from seasoned litigators of similar age and experience in this area. This group typically charges no more than $400 for this type of work. Since the adjusted hourly rates already take into account the attorneys' level of experience, no further adjustment is necessary on this factor.[28] In the end, consideration of the *Johnson* factors points persuasively to the conclusion that the lodestar figure is appropriately calculated as $632,377.50, and this is the appropriate attorneys' fees award in this case.

---

[28] Plaintiffs offer three additional observations based on the *Johnson* factors: (i) plaintiffs' counsel accepted this case on a contingency fee arrangement; (ii) plaintiffs sought a speedy resolution of this case, in part due to the fact that plaintiff Fishman is 72-years old; and (iii) plaintiffs obtained a $36 million award, which, in the plaintiffs' view, likely did not fully capture the extent of defendants' injuries. The first two points, while marginally relevant, are not significant enough to warrant adjustment, and the third point is too speculative to merit consideration.

An appropriate Order will issue.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of

record.

Alexandria, Virginia
October 18, 2010

/s/

**T. S. Ellis, III**
**United States District Judge**

18