IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| IN RE: OUTSIDEWALL TIRE | ) | |
| LITIGATION | ) | Civil Action No. 1:09cv1217 |

## MEMORANDUM OPINION

At issue post-judgment in this copyright infringement and conversion case is a dispute between (1) plaintiffs, who won a final and now-affirmed $26 million judgment against various foreign corporations and (2) Gilbert LLP, plaintiffs' former counsel, over the value of the latter's lien for fees and expenses, filed pursuant to Va. Code § 54.1-3932. This is, in essence, a fee dispute between a law firm and the firm's former clients. It arises because post-judgment, but prior to completion of the appeal, the two former Gilbert LLP attorneys who led the effort to win the judgment—August Matteis and William Copley—left Gilbert LLP to form their own law firm, Weisbrod, Matteis & Copley PLLC ("WMC"). When this occurred, plaintiff, Jordan Fishman, elected to discharge the Gilbert law firm as plaintiffs' counsel and to retain instead WMC as plaintiffs' counsel. Thereafter, the Gilbert law firm, based on its fee contract with plaintiffs and the work it had performed on the case, filed a lien in this district for fees and expenses under Va. Code § 54.1-3932, claiming more than $4.5 million in fees plus a share of the moneys received from the currently underway judgment collection efforts, and more than $1.8 million in expenses. Plaintiffs do not contest the validity of the lien, but reject the amounts claimed as excessive, unreasonable, and contrary to settled and controlling Virginia law, which allows the discharged Gilbert law firm a reasonable fee based not on the fee contract between plaintiffs and the Gilbert law firm, but solely on the basis of *quantum meruit*.

1

This memorandum opinion resolves this dispute and concludes, for the reasons that follow, that the appropriate, fair, and reasonable value of the Gilbert law firm's lien is $1,958,341.67.

## I.

Plaintiffs in the underlying case are (i) Jordan Fishman, a Florida citizen, and three companies he owns and controls, namely (ii) Tire Engineering and Distribution, LLC, a Florida company, (iii) Bearcat Tire ARL LLC, also a Florida company, and (iv) Bcatco A.R.L., Inc., which is incorporated under the laws of the Jersey Channel Islands. During times relevant to this litigation, plaintiffs were in the business of designing, manufacturing and selling highly specialized tires for use on underground mining vehicles.

There were two sets of defendants in the underlying litigation. The first set, collectively referred to as the "Al Dobowi defendants," consisted of (i) Al Dobowi Tyre Co. LLC, (ii) Al Dobowi Ltd., (iii) TyreX International, Ltd., and (iv) TyreX International Rubber Co., Ltd., all of which were headquartered in the United Arab Emirates and owned by Surender Kandhari, a Dubai citizen. The second set of defendants, collectively referred to as the "Linglong defendants," were (i) Shandong Linglong Rubber Co., Ltd. and (ii) Shandong Linglong Tire Co., Ltd., both of which were incorporated and based in China. At all relevant times, the Al Dobowi and Linglong defendants were engaged in the business of designing, manufacturing, and selling rubber tires, including underground mining tires.

By 2009, Jordan Fishman had become convinced that his head of sales had conspired with plaintiffs' competitors, the Al Dobowi and Linglong defendants, to steal plaintiffs' copyrighted underground mining tire blueprints and designs and then to sell knock-off copies of plaintiffs' tires around the world, thereby damaging plaintiffs. Accordingly, Fishman sought counsel to vindicate plaintiffs' rights. In the end, he chose the Gilbert law firm and on August 4,

2

2009, he signed a contingent fee letter agreement with the Gilbert law firm. This letter agreement, drafted by the Gilbert law firm, provides in essence that plaintiffs would pay the Gilbert law firm a contingency fee equal to 40 % of the gross amount of any sum recovered in attorney's fees. The agreement also notes that plaintiffs would reimburse the Gilbert law firm for "all costs and expenses related to this matter from the gross amount received by it." The letter concludes with a termination provision that provided that in the event Fishman terminated the firm's representation, the Gilbert law firm "will be entitled to a fee based upon the hours expended by the Firm on this representation at the hourly rates normally charged by the involved personnel for the type of work rendered." *Id.*[1]

From the date of plaintiffs' retention of the Gilbert law firm until plaintiffs' discharge of the firm in or around October 2011, plaintiffs' case was handled chiefly by Matteis, as lead counsel, and Copley. Other Gilbert law firm lawyers assisted Matteis and Copley in litigating the case, but played less substantial roles in the case.

On October 28, 2009, plaintiffs, by counsel, filed two complaints in this district, one against the Al Dobowi defendants and one against the Linglong defendants. The two suits were promptly consolidated after which the parties briefed and argued various Rule 12 threshold motions and then proceeded to conduct discovery. The discovery period was marked by a number of disputes, which the record reflects were fully briefed and argued. After completion of discovery, defendants sought summary judgment on all nine counts and succeeded on four counts. Plaintiffs then proceeded to trial on the remaining counts: (1) violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*, (2) violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as to

---

[1] *See* Memorandum in Support of Plaintiffs' Motion to Determine Value of Gilbert LLP's Lien for Attorney's Fees and Costs, Ex. 1 at 3.

3

registered marks, (3) violation of the Lanham Act as to unregistered marks, (4) common law conversion, and (5) common law civil conspiracy.

During the six-day trial, the parties presented live and videotaped testimony from a number of witnesses, substantial documentary evidence, and competing expert testimony on the issues of infringement and damages. In the end, the jury returned a verdict in favor of plaintiffs, awarding plaintiffs $26 million in damages jointly and severally against all defendants. Defendants' post-verdict Rule 50 motion met with only limited success; the registered trademark claim was dismissed for lack of evidence and the claim based on all but two of the unregistered marks suffered the same fate. Defendants' new trial motion failed as the record plainly supported the remaining verdicts and dismissal of some claims did not undermine the jury's damages award, as the measure of damages was the same for all counts. Also post-trial, plaintiffs sought and obtained a $632,377.50 attorney's fee award against the Al Dobowi defendants on the ground that the Al Dobowi defendants' malicious, willful, and deliberate infringing conduct made this an "exceptional" case warranting a fee award pursuant to 15 U.S.C. § 1117(a). *See In re: Outsidewall Tire Litigation*, 748 F. Supp. 2d 557 (E.D. Va. 2010).

Defendants appealed and on June 6, 2012, the Court of Appeals for the Fourth Circuit reversed the remaining trademark and conspiracy verdicts, but nonetheless upheld the $26 million judgment against defendants based on the jury's verdicts on the conversion and copyright violation claims. *See Tire Eng'g and Distrib., LLC v. Shandong Linglong Rubber Company, Ltd.*, 682 F.3d 292, 298 (4th Cir. 2012). Further, the Court of Appeals vacated the fee award inasmuch as the court had reversed the verdict on the remaining trademark claims, which were the sole basis for the award. *Id.* Importantly, in vacating the § 1117(a) fee award, the Court of Appeals did not reach, review, or decide the merits of the methodology and judgments made in connection with the award.

4

Prior to the December 2011 oral argument in the Court of Appeals, Messrs. Matteis and Copley, in October 2011, elected to leave the Gilbert law firm and establish their own firm, WMC. Both firms offered to continue to represent plaintiffs. After consulting with both firms, plaintiffs chose to stay with Matteis and Copley and accordingly discharged the Gilbert law firm and retained WMC to represent plaintiffs in this case. Shortly thereafter, the Gilbert law firm, in January 2012, filed a Notice of Former Counsel's Lien under Virginia Code § 54.1-3932.

Once the $26 million judgment against both defendants became final and defendants declined to pay, WMC, on plaintiffs' behalf, commenced a vigorous and wide-ranging collection effort. This effort has included initiating lawsuits to compel banks to turn over defendants' assets in the banks' possession[2] and proceedings to enforce subpoenas and garnishments in courts across the country. [3] As of November 2013, approximately $546,000 had been recovered in garnishment proceedings. Significantly, these collections efforts have led to an agreement by the Linglong defendants to pay plaintiffs $15.5 million to settle and resolve the Linglong defendants' liability in this case. This event makes more immediate the need to resolve the instant fee dispute and assess the value of the Gilbert law firm lien.

---

[2] *See, e.g., Tire Eng'g & Distrib. LLC v. Bank of China*, 740 F.3d 108 (2d Cir. 2014).

[3] Among the garnishment actions pursued by WMC on plaintiff's behalf are the following: *In re Outsidewall Tire Litig.*, 4:13-mc-01964 (S.D. Tex.) (against American Omni Trading Co. L.L.C.); *In re Outsidewall Tire Litig.*, 4:13-mc-01964 (N.D. Ohio) (against Atlas Tire Co.); *In re Outsidewall Tire Litig.*, 4:13-mc-01964 (N.D. Ohio) (against Hercules Tire and Rubber Co.); *In re Outsidewall Tire Litig.*, 2:13-mc-00315 (C.D. Cal.) (against Horizon Tire Inc.); *In re Outsidewall Tire Litig.*, 13 MC 249, (D. Ore.) (against Icon Tire Co.); *In re Outsidewall Tire Litig.*, 3:13-mc-00088 (N.D. Tex.) (against Maffeo Tire Group LLC); *In re Outsidewall Tire Litig.*, 2:13-mc-00023 (W.D. Tenn.) (against TBC Corp.); *In re Outsidewall Tire Litig.*, 2:13-mc-00315 (C.D. Cal.) (against Tireco, Inc.); *In re Outsidewall Tire Litig.*, 2:13-mc-00315 (C.D. Cal.) (against Transcontinental Tire Co.); *In re Outsidewall Tire Litig.*, 1:13-mc-22577 (S.D. Fla.) (against Universal Tire International); *In re Outsidewall Tire Litig.*, 1:13-mc-22577 (S.D. Fla.) (against Zafco International Inc.); and *Tire Eng'g & Distrib. L.L.C., v. Al Dobowi Ltd.*, 2:13-mc-00302 (D.N.J.) (against Foreign Tire Sales).

## II.

It is necessary at the outset to address two issues: (1) jurisdiction and (2) choice and content of governing law. This necessity arises because the Gilbert law firm has filed suit in the District of Columbia (D.C.) against defendants claiming that the firm is entitled to a fee and costs in this case as provided for in the contingent fee agreement Fishman and the firm signed in D.C. Although the Gilbert law firm is plainly entitled to recover an appropriate fee and costs in this case, this district, not the D.C. court, is the appropriate forum to adjudicate this claim and Virginia law, not the contingent fee agreement, provides the proper measure by which to determine the proper fee and costs to which the Gilbert law firm is entitled.

### A.

There can be no substantial doubt that this court has ancillary or supplemental jurisdiction to resolve this fee dispute and to value the lien filed here under Virginia law. This follows from the fact that the action was filed and fully litigated here, and the lien was filed here. Long-settled circuit precedent makes clear that in these circumstances, this court has ancillary or supplemental jurisdiction to resolve the instant fee dispute and value the lien. Thus, more than half a century ago, the Fourth Circuit in *American Federation of Tobacco-Growers v. Allen*, 186 F.2d 590, 592 (4th Cir. 1951), reached this result, noting as follows:

> It is argued that the controversy over fees is one which the parties should settle in the state courts as there is no diversity of citizenship; but the controversy is ancillary to the handling of a case in the federal court, the attorney who alleges that he has been mistreated is an officer of the court engaged in the handling of the case there pending, and the controversy relates to funds received by a party in a settlement of the case . . ..

More recently, the Fourth Circuit in *Marino v. Pioneer Edsel Sales, Inc.*, 349 F.3d 746, 753 (4th Cir. 2003) confirmed this principle, noting that it was incumbent on the district court to resolve a

6

fee dispute arising from a lawsuit litigated there.  Nor is the application of this principle limited to the Fourth Circuit.[4]  As a leading treatise notes,

> One of the best-established uses of ancillary jurisdiction is over proceedings concerning costs and attorney's fees.  Ancillary jurisdiction supports disputes concerning costs and fees for the case that invoked federal subject matter jurisdiction.

13 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3523.2 (3d ed.).  And it is worth noting that courts typically cite judicial efficiency and fairness in support of the existence of a court's ancillary jurisdiction to resolve fee disputes.  In the Fourth Circuit's words, "[i]t is important that the district court remain primarily responsible for resolving fee disputes, because it is in the better position to evaluate the quality and value of the attorney's efforts." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988).[5]  The Sixth Circuit has made the same point in support of the principle, noting that "[u]nlike a state court judge hearing a separate contract action, a federal judge who has presided over a case is already familiar with the relevant facts and legal issues." *Kalyawongsa*, 105 F.3d at 287.

In sum, it is clear not just that this court has ancillary jurisdiction to resolve this fee dispute and determine the value of the lien, but also that it is the proper forum to do so.

---

[4]  *See, e.g., Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999); *Kalyawongsa v. Moffett*, 105 F.3d 283, 287-88 (6th Cir. 1997); *Cluett, Peabody & Co., Inc. v. CPC Acquisition Co., Inc.*, 863 F.2d 251, 256 (2d Cir. 1988); *Novinger v. E.I. DuPont de Nemours & Co., Inc.*, 809 F.2d 212, 217 (3d Cir. 1987); *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir. 1982); *Grimes v. Chrysler Motors Corp.*, 565 F.2d 841, 844 (2d Cir. 1977).

[5]  *See also Robinson v. Equifax Info. Serv's., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) (noting that "because a district court has close and intimate knowledge of the efforts expended and the value of the services rendered, the fee award must not be overturned unless it is clearly wrong") (citation omitted).

**B.**

It is equally clear that this fee dispute and the determination of the lien's value are matters governed by Virginia law, not D.C. law.  This follows, as noted, from the fact that the case was filed and fully tried in this Virginia forum and hence the legal services rendered pursuant to the contingent fee agreement were substantially performed here.  And it is also true that in providing these legal services, the Gilbert law firm lawyers were at all times subject to the ethical standards and rules of the Supreme Court of Virginia,[6] which limit the Gilbert law firm to seek no more than a reasonable fee in this case.  *See* Va. Rules of Prof. Conduct § 1.5(a); *see also Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. P'ship*, 480 S.E.2d 471, 473 (Va. 1997).

More specifically, where, as here, a client discharges counsel without cause—as clients are entitled to do in Virginia—it is settled Virginia law that the discharged counsel may recover only a reasonable fee for actual services rendered on a *quantum meruit* basis regardless of any contract to the contrary.  In the words of the Supreme Court of Virginia,

> when . . . an attorney employed under a contingent fee contract is discharged without just cause and the client employs another attorney who effects a recovery, the discharged attorney is entitled to a fee based upon *quantum meruit* for services rendered prior to discharge and, as security for such fee, to the lien granted by Code § 54-70.

*Heinzman v. Fine, Fine, Legum and Fine*, 234 S.E.2d 282, 286 (Va. 1977); *see also Hughes v. Cole*, 465 S.E.2d 820, 833 (Va. 1996); *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463, 472 n.27 (E.D. Va. 1994) (recognizing that "[a] client may always discharge his attorney and, in

---

[6] *See* Local Rule 83.1(I) ("The ethical standards relating to the practice of law in civil cases in this Court shall be Section II of Part Six of the Rules of the Virginia Supreme Court as it may be amended or superceded from time to time.").

that event, the fee is limited to a reasonable fee for actual services rendered upon a *quantum meruit* basis, regardless of any contract to the contrary") (citations omitted).

Given this clear governing Virginia law, the Gilbert law firm's argument that it is entitled to recover more than *quantum meruit* must be rejected. The various theories the Gilbert law firm advances in support of this argument are all precluded by the clear holding and teaching of *Heinzman*. First, the Gilbert law firm contends that the original engagement letter Fishman signed requires judicial approval of the number of hours claimed and the hourly rates charged without regard to whether they are reasonable or exceed *quantum meruit*. This contention is flatly contrary to *Heinzman*, which makes clear that the Gilbert law firm can recover no more than a *quantum meruit* fee. Any greater fee, *Heinzman* teaches, would impair a client's unconditional right to discharge counsel with or without cause. *See Heinzman*, 234 S.E.2d at 285-86.

Similarly meritless is the Gilbert law firm's contention that it is entitled to a contingent fee. Specifically, the Gilbert law firm contends that it is entitled to a substantial portion of a 40% contingency fee based on plaintiffs' total recovery, to the extent such a contingent fee amount exceeds the lodestar amount. In support of this contention, the Gilbert law firm cites the termination provision in the engagement letter and *Morris Law Office, P.C. v. Tatum*, 369 F. Supp. 2d 812 (W.D. Va. 2005). Neither the case cited nor the engagement letter are of any avail to the Gilbert law firm in this respect; neither allows the firm to escape the rule in *Heinzman* that limits the Gilbert law firm to a *quantum meruit* award. Indeed, *Tatum* squarely rejects the Gilbert law firm's contention, as it clearly holds that *Heinzman* precluded the law firm in that case from recovering more than a *quantum meruit* fee, regardless any provision in the retention agreement. *Id.* at 814-15. In sum, the settled and iron clad rule in Virginia is that a discharged law firm may recover a fee measured not by a pre-existing fee agreement, but solely

by *quantum meruit*. *See id.* The Gilbert law firm understandably seeks to avoid the *Heinzman* rule by citing cases from other jurisdictions, including Florida. *See, e.g., Buckley Towers Condominium, Inc. v. Katzman Garfinkel Rosenbaum, LLP*, 519 F. App'x 657 (11th Cir. 2013). This effort fails. The Supreme Court of Virginia in *Heinzman* recognized that states differed on the rule governing the amount of a fee a discharged attorney may recover from a former client and specifically rejected the breach of contract theory Florida applies in these circumstances. *See Heinzman*, 234 S.E.2d at 285. In sum, the Gilbert law firm may recover here no more than a *quantum meruit* fee.

   *Quantum meruit*—literally "as much as is deserved"[7]—is an equitable doctrine designed to prevent unjust enrichment from one who benefits from the labor of another.   Virginia law is clear that "[w]hen a discharged attorney, in a contingent fee context, seeks recovery for work performed before the discharge, the *quantum meruit* determination looks to the reasonable value of the services rendered, not in benefit to the client, but, in themselves." *Heinzman*, 234 S.E.2d at 286 n.4; *see also Hughes*, 465 S.E.at 833.   Also clear is that under Virginia law, the methodology used to determine the *quantum meruit* fee is essentially similar to the methodology used in fee-shifting cases, in that both begin the analysis with the familiar lodestar calculation, which may be adjusted upward or downward.   *See County of Campbell v. Howard*, 112 S.E. 876, 885 (Va. 1922); *see also Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974). It is also important to note that in a case of a fee measured by *quantum meruit* (i): "It is clear that, in Virginia, the focus is on the objective value of the services rendered by the terminated attorney, not the value of the benefit conferred." *Morris Law Office, P.C. v. Tatum*, 388 F. Supp. 2d 689, 715 (W.D. Va. 2005).   Client benefit in Virginia is relevant only to the

---

[7] *See* Black's Law Dictionary (2d ed. 1910).

degree that the results obtained by the attorney shed light upon the efficiency and value of the work performed. *County of Campbell*, 112 S.E. at 885. Thus, time spent on unsuccessful claims is inefficient, and may decrease a *quantum meruit* award.

It remains now to apply these principles to the Gilbert law firm's lien for fees and expenses under Va. Code § 54.1-3932, hereinafter referred to as the Gilbert law firm's "Fee Claim."

## III.

This is not the first time the Gilbert law firm has submitted a fee petition in this case. Following disposition of defendants' post-verdict Rule 50, Fed. R. Civ. P. motions, the Gilbert law firm, on behalf of plaintiffs, submitted a fee petition seeking fees based on the surviving trademark infringement claim.[8]   The Lanham Act permits an award of reasonable fees in "exceptional cases." 15 U.S.C. § 1117(a); *see also Retail Serv's. v. Freebies Publ'g*, 364 F.3d 535, 550 (4th Cir. 2004). This first fee petition was fully briefed and argued and ultimately granted in part by this court's Memorandum Opinion and Amended Final Order. *See Outsidewall Tire*, 748 F. Supp. 2d at 557; *In re: Outsidewall Tire Litigation*, 1:09cv1217 (E.D. Va. Nov. 3, 2010) (Amended Final Order). Although the $26 million verdict against both defendants was upheld on appeal on other grounds, plaintiffs' trademark claims were vacated on appeal and hence the Court of Appeals did not reach or review the district court decision on the first fee petition, which was based solely on plaintiffs' trademark claim.     Nonetheless,      as discussed *infra*, the decision on the first fee petition has limited but important relevance with

---

[8]  In the district court, the jury's verdicts were sustained with respect to plaintiffs' claims of copyright infringement, conspiracy and conversion. The jury's trademark infringement verdict survived only with respect to two unregistered trademarks. *See In re: Outsidewall Tire Litigation*, 1:09cv1217 (E.D. Va. July 21, 2010) (Order). On appeal, the jury's verdicts on the conspiracy and trademark infringement claims were vacated. *See Tire Eng'g and Distrib., LLC*, 682 F.3d at 292.

respect to the Fee Claim at bar. But it is important to note that the conclusions reached with respect to the trademark fee petition were not adopted as controlling or as law of the case here. Instead, the result reached here is based on a *de novo* review of the Fee Claim, the records submitted in support thereof, and the parties' briefs and arguments on the value of the Fee Claim. To be sure, however, some of the settled legal principles and cases relied on in resolving the trademark fee petition are also properly applicable to resolution of the dispute at bar. The parties dispute whether fee shifting cases are relevant to this dispute. They are; both fee shifting cases and *Heinzman*-type cases sensibly and appropriately use essentially lodestar methodology. *See Morris Law Office*, 388 F. Supp. 2d at 715 ("both *Heinzman* and *County of Campbell*" provide for "what has become known as a 'lodestar' fee . . . .").

## IV.

In the Fee Claim at issue, the Gilbert law firm claims that its lawyers spent 10,955.8 hours on the case at hourly rates ranging from $375 to $900 per hour, totaling a fee of $4,542,228.50.[9]   Added to this, the Gilbert law firm claims expenses totaling $1,812,149.20. At the outset, it must be noted that the Gilbert law firm's Fee Claim is in sharp contrast to the firm's previously-submitted trademark fee petition. Although both use the lodestar approach, which is an appropriate starting point to determine a *quantum meruit* award,[10] the record reflects that Matteis, then a Gilbert law firm lawyer, exercised billing judgment to eliminate unjustified time entries from the trademark fee petition,[11] including (i) entries for time charged by non-lawyers,

---

[9] In its reply brief, the Gilbert law firm appears to reduce its total request for fees to $4,101,395.50, but it will be held to the amount it originally claimed in its time entries. In any event, the reduced request is insufficient to account for all of the various deficiencies in the Gilbert law firm's time entries.

[10] *See Morris Law Office*, 388 F. Supp. 2d at 715.

(ii) entries relating to unsuccessful claims, (iii) entries relating to time spent by newly-assigned lawyers familiarizing themselves with the case, and (iv) entries relating to non-legal tasks. In sharp contrast to this, the Fee Claim at issue here reflects no such editing or screening of the time entries, nor any exercise of billing judgment on the more than 4,600 entries to eliminate unjustified entries. It is clearly a **"kitchen sink"** approach in which every one of the 4,648 entries has been thrown in the hopper, including (i) entries seeking compensation for summer associates, (ii) entries relating to unsuccessful claims, (iii) entries relating to time spent by newly-assigned lawyers familiarizing themselves with the case, (iv) entries relating to travel to Dubai, (v) entries relating to non-legal tasks, and (vi) entries devoted to general firm matters instead of work on behalf of the plaintiffs.[12]

### A.

A useful starting part in the lodestar analysis is the reasonableness of the hourly rates claimed in the Fee Claim. Here, the claimed hourly rates for various Gilbert law firm attorneys range from $375 per hour to $900 per hour. These are essentially the same rates that were at issue in the previously-submitted trademark fee petition, and as the record reflects, these rates were rejected as excessive. *Outsidewall Tire*, 748 F. Supp. 2d at 568-69. It is worth noting with

---

[11] Notably, while now-WMC lawyers Matteis and Copley carefully edited the time entries submitted in the trademark fee petition, unlike the Gilbert law firm in the present case, this court *still* applied a 60 % reduction to the claimed hours in the trademark fee petition. *See Outsidewall Tire*, 748 F. Supp. 2d at 567. Thus, the Gilbert law firm's argument that WMC is taking a position now contrary to what it represented in the previously-submitted trademark fee petition is meritless. The record reflects that Matteis and Copley are essentially arguing here that the Gilbert law firm should exercise the same billing judgment that they used when they submitted the trademark fee petition as Gilbert law firm lawyers.

[12] In their submissions on this fee and cost dispute, plaintiffs submitted a detailed line-by-line analysis and critique of the Gilbert law firm's fees submission. *See* Memorandum in Support of Plaintiffs' Motion to Determine Value of Gilbert LLP's Lien for Attorney's Fees and Costs, Ex. 8. A review of the record as a whole supports the accuracy and helpfulness of this line-by-line analysis and critique.

respect to the Gilbert law firm's claimed hourly rates that Rule 1.5(b) of the Virginia Rules of Professional Conduct requires a law firm to disclose the rates that a client will be charged. It is, at best, unclear that this occurred in all respects in this case. Moreover, the Gilbert law firm has adduced no persuasive evidence to support the reasonableness of these rates for a case of this sort in Northern Virginia. As occurred with respect to the trademark fee petition, the Gilbert law firm has not submitted an affidavit from an experienced attorney unconnected with this case attesting to the reasonableness of its claimed rates. *See Robinson*, 560 F.3d at 245 ("Examples of the type of specific evidence that we have held is sufficient to verify the prevailing market rates are affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community."). This is unsurprising; the Gilbert law firm's claimed rates are not reasonable by Virginia standards. At least one court has noted that experienced intellectual property attorneys working in Northern Virginia can reasonably charge up to $380 per hour for partners and $250 per hour for associates. *See Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 2009 WL 3423848 at *5 (E.D. Va. 2009). To be sure, the prevailing hourly rates of attorneys in the District of Columbia are higher than the rates of attorneys in Northern Virginia. Yet, the fact that some attorneys in D.C. may charge close to $1000 per hour does not serve to make the Gilbert law firm's asserted rates reasonable. *See Outsidewall Tire*, 748 F. Supp. 2d at 568-69; *see also Robinson*, 560 F.3d at 245 ("Plaintiff has produced no evidence that the Laffey Matrix, which pertains to hourly rates of litigation attorneys in Washington, D.C., is a reliable indicator of the hourly rates of litigation attorneys in [Alexandria], Virginia, a suburb of Washington, D.C."); *Grissom v. The Mills Corp.*, 549 F.3d 313, 323 (4th Cir. 2008) (same). Courts in this district have recognized rates of up to $420 per hour for partners and $250 to $300 per hour for associates as reasonable and appropriate for

cases similar in nature, difficulty, and complexity to the instant case.[13]  Additionally, this court's

long and extensive experience in this district confirms that Virginia attorneys can competently

perform the work necessary in cases of this sort "for between $275 and $400 per hour."

*Outsidewall Tire*, 748 F. Supp. 2d at 568. Therefore, for the purposes of determining the

lodestar amount, the following rates have been applied: $400 per hour for partners, $350 per

hour for counsel, and $275 per hour for associates.

## B.

The next step in the lodestar analysis is to examine the Fee Claim to determine the

appropriate number of attorney hours to multiply by the hourly rates. The Fee Claim states that

Gilbert law firm attorneys charged almost 11,000 hours to this case. This claim, on its face, is

plainly excessive.  Close examination of the submitted time entries makes clear that the Gilbert

law firm's billing records are rife with flawed entries that make its records inadequate and

unreliable for lodestar calculation purposes. These flawed entries include, for example, (i)

entries that contain excessively vague and inadequate task descriptions, (ii) entries that lump

numerous tasks together for one time entry, (iii) entries claiming travel time, (iv) entries claiming

time for multiple attorneys for the same task when a single or fewer attorneys would have

sufficed, (v) entries for time devoted to claims that ultimately did not succeed, (vi) entries

---

[13] *See Jones v. Southspeak Interactive Corp. of Delaware*, 2014 WL 2993443 at *7 (E.D. Va. 2014) (reasonable rate for experienced counsel was $420 per hour based on extensive evidence submitted regarding prevailing market rates in the locality); *Auto Fin. Corp. v. EEE Auto Sales, Inc.*, 2011 WL 3422648 at *8 (E.D. Va. 2011) (reasonable market rates in Northern Virginia were $335-380 per hour for partners and $250 per hour for associates); *Lake Wright Hosp. LLC v. Holiday Hosp. Franchising, Inc.*, 2009 WL 4841017 at *7 (E.D. Va. 2009) (rate of $350 per hour was reasonable and appropriate for law firm partner with 15 years of experience); *Alford v. Martin & Gass, Inc.*, 2009 WL 2447936 at *5 (E.D. Va. 2009) ($350 per hour was reasonable rate for experienced counsel).

reporting time for law students temporarily employed for the summer, and (vii) entries reporting time spent on other matters.[14]

These flawed entries effectively preclude any confident assessment of whether the time claimed for a task is reasonable. Thus, some entries describe a task in such vague or general terms as to bar or frustrate any attempt to assess the reasonableness of the time devoted to that task. Examples of this type of flaw include numerous entries that describe a task simply as "document review" or "work on discovery" or "review electronically stored litigation," etc. These and other vague task descriptions that do not disclose the nature, volume or relevance of the documents prevent any accurate or confident assessment of the reasonableness of the time claimed to have been spent on the tasks described. As one court put it, the absence of detailed documentation precludes the court, as well as opposing counsel, from making a "fair evaluation of the time expended . . . [and] the nature and need for the service." *Uzzell v. Friday*, 618 F. Supp. 1222, 1226 (M.D.N.C. 1985) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 441 (1983)). The same barrier to accomplishing a reasonableness review exists with respect to entries that lump multiple tasks together under a single amount of time, a practice known as "lumping". As one court put it, "[lumping] simply does not provide the court with a sufficient breakdown to meet [the] burden to support [a] fee request in specific instances. Inadequate documentation includes the practice of grouping, or 'lumping,' several tasks together under a single entry, without specifying the amount of time spent on each particular task." *Project Vote/Voting for America, Inc. v. Long*, 887 F. Supp. 2d 704, 716 (E.D. Va. 2012) (internal quotation marks and

---

[14] *See, e.g.*, Memorandum in Support of Plaintiffs' Motion to Determine Value of Gilbert LLP's Lien for Attorney's Fees and Costs, Ex. 8 (entries by K. Hale on Oct. 6, 2009, April 14, 2010, June 8, 2010, and August 18, 2010; three entries by D. Sugimura ("DYS") on May 6, 2010; entry by L. Martinez ("LCM") on November 1, 2010).

citations omitted).   Examples of this type of flawed entry include (i) "Discovery issues; prepare for argument," (ii) "[A]ttend pretrial conference, file deposition counter designations, prepare evidentiary outline," and (iii) " [prepared] facts for Fishman direct examination and jury instructions, [prepared] objections to defendants' deposition designations, review and analyze defendants' motions in limine [,] and conferences with A. Matteis . . . ."   Nor are these flawed vagueness and lumping entries few or rare; the time records supporting the Fee Claim are replete with these and other flawed entries.

Case law confirms that in these circumstances—excessively vague task descriptions and lumping—courts must exercise sound judgment based on knowledge of the case and litigation experience to reduce the number of hours by an appropriate percentage. Thus, courts faced with excessively vague or inadequate descriptions of tasks in fee claims have reduced fee claims by percentages ranging from 20 % to 90 %.[15]  Similarly, courts confronted with time records infected with lumping have reduced fee claims by percentages ranging from 10 % to 20 %. [16]  In

---

[15] *See Bishop v. Colvin*, 2014 WL 2093950 at *3 (D. Md. 2014) ("Because of the imprecise tracking of hours and tasks throughout the itemized statement of fees . . . I recommend reducing the total hours allowed by twenty percent."); *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't. of Justice*, 825 F. Supp. 2d 226, 230 (D.D.C. 2011) (reducing hours forming the basis for an award by 37.5 % to account for "inaccuracies and overbilling that may have occurred as a result of . . . unacceptable timekeeping habits."); *Local 32B-32J, Serv. Emp. Int'l Union, AFL-CIO et al. v. Port Authority of N.Y. and N.J.*, 180 F.R.D. 251, 253 (S.D.N.Y. 1998) ( "the vague descriptions contained in many of the attorney time records" justified a "20 % reduction in the amount" requested); *Amato v. City of Saratoga Springs*, 991 F. Supp. 62, 66 (N.D.N.Y. 1998) ("grossly inadequate specificity in the proffered billing records" combined with an unreasonably high request for hours resulted in a reduction of the number of hours claimed by 90 %).

[16] *See Elderberry of Weber City, LLC v. Living-Centers Southeast, Inc.*, 2014 WL 3900389 at *4 (W.D. Va. 2014) ("When confronted with block billing, courts often reduce the fee award by a fixed percentage, striking a balance between the troubling lack of specificity block billing presents and the unfairness of denying an otherwise-properly-granted fee award altogether." ); *ProjectVote*, 887 F. Supp. 2d at 716 (due to lumping, "the court will apply a fixed percentage reduction of 10 percent to the fee award in this case").

sum, where, as here, time records include lumping and vague task description flaws and it is impractical to review over 4000 entries to attempt to ascertain precisely how many hours to deduct to account for these flaws, courts must make a judgment based on knowledge of the case and litigation generally in reducing the relevant number of hours forming the basis for a fee award. *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006). A careful review of these records coupled with a thorough knowledge of this case compels the conclusion that a 55 % reduction in the Gilbert Law Firm's claimed hours is appropriate.

Lumping and vague task descriptions are not the only flaws in the time records supporting the Fee Claim. There are also a number of time entries claiming attorney travel time. The decision to compensate an attorney for his or her travel time is within the district court's discretion. *U.S. ex rel. Abbott-Burdick v. Univ. Med. Assoc's*, 2002 WL 34236885 at *19 (D. S.C. 2002). Although courts take a number of different approaches to a claim for compensation of travel time, "many courts simply reduce the number of billable hours related to travel time unless the petitioner can demonstrate that such time was productively spent working on the client's case." *Id.* Some courts suggest that a failure to reduce or eliminate claims for travel time indicates a lack of billing judgment, and warrants a further reduction to the hours submitted for the basis of a fee award. *ProjectVote*, 887 F. Supp. 2d at 716. *See also Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 195 (D. Mass. 2013) ("The Court also reduces the travel time by fifty percent.").

The Gilbert law firm's billing records reflect a number of entries claiming travel time, but the records fail to demonstrate or record whether the traveling attorneys actually performed work for plaintiffs while traveling. Most of the entries simply read "Travel to" and "Travel from" with no substantive descriptions of any work completed. Moreover, the reduction in travel time is particularly necessary in this case because many of the travel entries were travel to and from

Dubai, resulting in a substantial number of hours claimed where the attorneys apparently did not do any actual work on behalf of plaintiffs. Nor is the Gilbert law firm's attempt to claim travel time limited to trips back-and-forth from Dubai. Its billing records also contain entries which claim travel time for trips to D.C. for hearings, as well as travel to various depositions. Indeed, the failure of the Gilbert law firm to reduce the amount of travel time it has submitted reflects a further lack of sound billing judgment on its part. *See ProjectVote*, 887 F. Supp. 2d at 716 ("The court agrees with Defendants that counsel should not recover their full market rate for travel from their offices in Washington, D.C., to Norfolk and Richmond, and that failure to reduce this time indicates a lack of billing judgment."). Finally, pursuant to this court's May 24, 2010 Order, the Al Dobowi defendants already reimbursed the Gilbert law firm for travel to Dubai, pursuant to the previously-submitted trademark fee petition.[17] To award the Gilbert law firm travel time for this trip would therefore be an unjustified double recovery. In sum, it is appropriate and reasonable to reduce the Gilbert law firm's claimed hours by an additional 2 % to account for inadequately justified claims for travel time.

Next, hours which are "excessive, redundant, or otherwise unnecessary" must be excluded from the lodestar calculation, as such hours are not reasonably expended on the relevant litigation. *ProjectVote*, 887 F. Supp. 2d at 709. The Fourth Circuit is especially sensitive to avoid the use of multiple attorneys for tasks where fewer attorneys will suffice. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994) ("[W]e have also been sensitive to avoid use of multiple counsel for tasks where such use is not justified by the contributions of each attorney."). This concern is heightened by the "repeated practice of multiple attorneys reporting time for the same task." *ProjectVote*, 887 F. Supp. 2d at 717. When an issue does not

---

[17] *See Outsidewall Tire*, 748 F. Supp. 2d at 567-69.

require the attention of multiple lawyers, courts will thus only award fees for the time of one attorney. *See Cox v. Reliance Std. Life Ins. Co.*, 179 F. Supp. 2d 630, 636 (E.D. Va. 2001).

The Gilbert law firm's time entries reflect that multiple attorneys attended hearings and depositions, presumably just to watch and observe. This practice is generally discouraged, especially in the Fourth Circuit, and billing time for three attorneys at every single hearing, including relatively minor motions and sanctions hearings, is unnecessary and inappropriate. *See Rum Creek*, 31 F.3d at 180.[18]  In response, the Gilbert law firm may argue that its attorneys were all performing essential tasks at these hearings. Yet, there is no way to glean this from the time entries, owing to the inadequate task descriptions in the billing records. Indeed, "due to the lack of specificity in billing, the court is unable to assess whether these and similar entries are a result of efficient division, or instead duplicative or otherwise unreasonable." *Project Vote*, 887 F. Supp. 2d at 717 n.19. The burden is firmly on the Gilbert law firm to demonstrate the necessity of sending numerous attorneys to every single hearing. This burden is not carried by time entries that read simply "attend hearing." This warrants a further reduction in the claimed hours by 3 %.

The *quantum meruit* calculation must be further reduced based on time entries related to claims which were ultimately unsuccessful, as this was not time efficiently spent. *See County of Campbell*, 112 S.E at 885. Summary judgment was granted on a number of plaintiffs' claims, including misappropriation of trade secrets. Yet, the Gilbert law firm has again attempted to recover fees based on time entries related to plaintiffs' trade secret claims. As this time was essentially unproductive, the claim for these entries must be reduced by some amount. Additionally, the Gilbert law firm has submitted time entries related to plaintiffs' civil

---

[18] Of course, it is common for firms to allow or invite attorneys who are not the presenters to attend hearings or motions concerning matters they may have done some work on for purposes of rewarding or training the lawyers. But the firm, not the client, should pay for this training and rewarding of lawyers.

conspiracy claim, which was initially successful, but then overturned by the Fourth Circuit. *See Tire Eng'g and Distrib., LLC*, 682 F.3d at 311. Of course, if successful and unsuccessful claims or motions are closely related, then time spent on an unsuccessful claim or motion might still be justifiably counted. But it is difficult, if not impossible, on the basis of the documentation submitted to determine whether this occurred. Given this, and given the difficulty of assessing with precision the number of hours that are properly deducted as having been inefficiently spent on unsuccessful claims, it is necessary to make a judgment in this regard based on the court's familiarity with the case and extensive experience in litigation of this sort. *Outsidewall Tire*, 748 F. Supp. 2d at 567. In the end, the Gilbert law firm's claimed hours are appropriately reduced by a further 3 % to account for claimed time spent on unsuccessful causes of action or motions.

It must also be noted that the Gilbert Law Firm's post-trial hours appear to be particularly excessive. Its total **"kitchen sink"** hours are 10,955.8, but the hours the Gilbert law firm submitted through trial were only 4897.6. It appears, therefore, that the Gilbert law firm is seeking fees for approximately as many hours of post-trial work as it seeks from its date of retention through trial. To be sure, the Gilbert law firm is entitled to post-trial hours and fees for its preparation of the briefs to the Fourth Circuit. But the post-trial hours seem excessive given that the Fourth Circuit oral argument in December 2011 was presented by WMC, not the Gilbert law firm, inasmuch as Matteis and Copley left the Gilbert law firm in October 2011, and that the Gilbert law firm did not file any post-trial enforcement actions on plaintiffs' behalf; WMC filed those actions. *See* note 3, *supra.* Finally, the Gilbert law firm made the decision to have Craig Litherland, rather than Copley, direct plaintiffs' post-judgment collection efforts.[19] It is difficult to see how the collection efforts by the Gilbert law firm were either substantial or effective. It

---

[19] *See* Matteis Reply Decl. ¶ 15.

appears that the only enforcement-related motion the Gilbert Law Firm filed at the direction of Litherland was a motion to register judgment in other jurisdictions,[20] and this motion was denied without prejudice because it was inadequately supported.[21] Thus, the Gilbert law firm's request for post-trial hours is plainly excessive, given that the firm appears to be seeking fees for roughly the same number of hours for post-trial work as the hours the firm spent from the beginning of the case through the conclusion of trial. To account for this defect in the Fee Claim, the Gilbert law firm's claimed hours are deducted an additional 2 %.

In sum, the claimed hours for the lodestar calculation will be reduced by 65 % to reflect the numerous deficiencies in the submitted time entries. The Gilbert law firm has claimed 10,955 hours in this case, so application of the 65 % reduction[22] yields a total of 3834.25 hours. Multiplying this amount by the adjusted hourly rates calculated earlier yields an adjusted figure of $1,237,720 that the Gilbert law firm can reasonably recover in fees.[23]

---

[20] *See* Matteis Reply Decl. ¶ 16.

[21] *See In re: Outsidewall Tire Litigation*, 1:09cv1217 (E.D. Va. Nov. 16, 2010) (Order) (Doc. 376).

[22] It is also worth noting that some courts recognize that it is appropriate to reduce the hours claimed where, as here, attorneys are on notice of deficiencies in time entries which were the subject of a ruling on a previous fee petition. *See Bishop*, 2014 WL 2093950 at *3 ("[A]n increase in the total reduction is warranted because [the attorney in the case] has not sufficiently adjusted his billing practices to reflect the previous recommendations of this Court."). The ruling on the trademark fee petition highlighted deficiencies of lumping and inadequate task descriptions in the Gilbert law firm's time records. *Outsidewall Tire*, 748 F. Supp. 2d at 567. A review of the time records makes clear that the Gilbert law firm did not remedy or adjust its time recording practices to fix defects called to the firm's attention. As noted, some courts have found a reduction in hours appropriate based on a firm's failure to adjust billing practices. However, the reductions in time already applied essentially take account of this factor and no further reduction is warranted.

[23] No further adjustment, upward or downward, is warranted by application of the *County of Campbell* factors.

**V.**

The costs or expenses the Gilbert law firm seeks to recover in the Fee Claim reflect the same "**kitchen sink**" approach the firm used in connection with its time records submitted in support of hours claimed. Emblematic of this "**kitchen sink**" approach is the firm's inexplicable claim to recoup $82 for a gift the firm sent to Fishman while Fishman was in the hospital recovering from surgery. Similarly egregious is the Gilbert law firm's claim that it should be reimbursed for an $845 bill for a dinner to which Fishman was invited by the firm chair. Also included in this category is the law firm's claim to be reimbursed for alcohol purchased for a firm party. Because the record does not present any basis or justification for reimbursement of these costs, they must be disallowed.

In general, the other costs sought in the Fee Claim fall into three categories[24]: (1) overhead expenses, such as internal copying, printing, and scanning of documents, telephone charges, online legal research charges, overtime meals, and HVAC; (2) expert fees and costs relating to technical expert Raymond Evans; and (3) expert fees and costs relating to damages expert Phil Nelson. Plaintiffs do not contest the amount sought in fees for the services of Mr. Evans—$45,660. They do contest the amounts sought in the first and third categories and hence these must be addressed.

It is well-settled that attorneys "are clearly not entitled to reimbursement of expenses where the request is for an amount which is excessive or otherwise noncompensable." *In re Bausch &*

---

[24] In their submissions on this fee and cost dispute, plaintiffs submitted a detailed line-by-line analysis and critique of the Gilbert law firm's costs submission. *See* Memorandum in Support of Plaintiffs' Motion to Determine Value of Gilbert LLP's Lien for Attorney's Fees and Costs, Ex. 9. A review of the record as a whole supports the accuracy and helpfulness of this line-by-line analysis and critique.

*Lomb, Inc. Sec. Litig.*, 183 F.R.D. 78, 89 (W.D.N.Y. 1998). Absent a specific agreement to the contrary, overhead expenses are typically neither taxable nor recoverable costs. *See Spicer v. Chicago Bd. Options Exchange Inc.*, 844 F. Supp. 1226, 1257 (N.D. Ill. 1993) ("Law firms are responsible for assuming . . . expenses as part of overhead . . . ."). And as in the case of establishing a proper fee amount for *quantum meruit* purposes, it is the Gilbert law firm that bears the burden of establishing that each expense is compensable and not excessive. *See Bausch*, 183 F.R.D. at 90 (finding expenses noncompensable because counsel "has not adequately demonstrated that [they were] reasonable or necessary"). *See also Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 12 F.3d 269, 272 (D.C. Cir. 1994) (expense request for "photocopying and telefaxing" was deemed unreasonable); *Burns v. Anderson*, 2006 WL 2456372 at *11 (E.D. Va. 2006) (noting that overtime meals and conference room catering could not "reasonably be charged" without further documentation).

The record reflects that the Gilbert law firm has not adequately borne this burden. There is no sound basis for charging as costs overtime meals, telephone charges, or online legal research charges, especially where, as here, the Gilbert law firm pays a flat rate for all online legal research charges. Although some cases understandably allow online legal research expenses as recoverable costs,[25] it is difficult to see how a flat rate charge paid by a firm can be allocated among the firm's many clients, and nothing in this record provides any basis for allocating a portion of the Gilbert law firm's flat rate to work done on behalf of plaintiffs. Thus, these

---

[25] *See, e.g., Burns*, 2006 WL 2456372 at *11. In *Burns*, the court awarded expenses to a prevailing party who recovered fees and expenses pursuant to a Pledge Agreement. *Id.* at *3. Thus, online legal research was properly included as a recoverable expense because it reduced the time the attorneys in *Burns* spent on the case. Had the Gilbert law firm provided a sound basis for allocating to plaintiffs a portion of its flat fee for online legal research, a different result might obtain here.

24

claimed overhead costs must be disallowed as inadequately supported, non-compensable, or excessive.

The parties' principal dispute focuses on the Gilbert law firm's request for reimbursement of $1,394,351 in costs related to Dr. Phil Nelson, the firm's damages expert. Courts must be "on guard against exorbitant expert fees, and retain the ultimate responsibility to keep litigation costs from becoming unreasonable." *Massasoit v. Carter*, 227 F.R.D. 264, 267 (M.D.N.C. 2005); *see also Jochims v. Isuzu Motors, Ltd.*, 141 F.R.D. 493, 497 (S.D. Iowa 1992) ("Continuing escalation of expert witness fees and the all too frequent attitude of experts that their fees should be set at the maximum-the-traffic-will-bear is of great concern."). The burden is on the Gilbert law firm to demonstrate the reasonableness of its proffered expert rate and fee. *Se-Kure Controls, Inc. v. Vanguard Prods. Grp., Inc.*, 873 F. Supp. 2d 939, 955 (N.D. Ill. 2012).

The rates charged by Dr. Nelson and his staff are unjustifiably high and must be adjusted downward. According to the Gilbert law firm, Dr. Nelson charged $850 per hour, and his senior and support staff charged $615 to $675 per hour and $375 to $425 per hour, respectively. In the court's experience and as the cases reflect, these rates are higher by a factor of two than the rates charged by comparable damages experts and support staff. *See, e.g., Nordock Inc. v. Sys. Inc.*, 927 F. Supp. 2d 577, 584 (E.D. Wis. 2013) (finding $475 per hour to be a reasonable rate for a damages expert in a patent and trademark case); *Se-Kure Controls*, 873 F. Supp. 2d at 955 (finding $405 per hour to be a reasonable expert rate). For example, in the *Isuzu Motors* case, the court found that, notwithstanding the fact that an expert was the leading authority on vehicle rollover and computer analysis of vehicle dynamics, the expert's requested hourly rate of $500.00 was "grossly excessive" and "astronomical." *Isuzu Motors*, 141 F.R.D. at 496. Significantly, the Gilbert law firm devotes less than one page to justify its request for all expenses, including fees associated with Dr. Nelson, and merely asserts conclusorily that the jury

"clearly relied upon this expert."[26]   Although it is reasonable to suppose that the jury paid some attention to Dr. Nelson's testimony, this in no way justifies the excessively high rates that he and his staff charged.  Accordingly, because the Gilbert law firm has not presented a reasonable or persuasive justification for Dr. Nelson's high hourly rate, this rate must be adjusted downward to $500 per hour, a rate more in line with reasonable rates charged by similar experts in this area. Additionally, the hourly rates charged by Dr. Nelson's senior staff will be adjusted to $350 per hour, and the hourly rates charged by Dr. Nelson's junior staff will be adjusted to $200 per hour. These rates are in line with rates charged by damages experts both in this forum, and elsewhere. *See, e.g.*, *Nordock*, 927 F. Supp. 2d at 584.

Next, the Gilbert law firm's attempt to shoehorn data entry costs into fees associated with Dr. Nelson—it seeks $253,173 for 612.5 hours of data entry performed at rates ranging from $375 to $675 per hour— must also be rejected.  It is hard to understand any justification for hourly rates that high for non-legal, indeed non-professional, personnel to accomplish the simple task of data entry.  Perhaps there is such a justification, but it is nowhere to be found in the Fee Claim submissions.  In these circumstances, as one court noted, a discount is necessary when the record "reveals several instances of excessive use of high-level, high-cost expert personnel, where lower-level and lower-cost personnel would have been able to accomplish the same result . . . but at a lesser expense." *In re Fleet/Norstar Sec. Litig.*, 974 F. Supp. 155, 158 (D. R.I. 1997).  Thus, the cost for data entry by Dr. Nelson's senior and junior staff must be reduced as plaintiffs contend.

Finally, it is noteworthy that in plaintiffs' original fee petition, only $931,154 was sought for the services of Dr. Nelson, as counsel eliminated "time spent preparing lost profit analyses that

---

[26] *See* Interested Party Gilbert LLP's Response in Opposition to Plaintiffs' Motion to Determine Value of Lien at 18.

were not used, preparing trial exhibits, and other minimally substantive tasks."[27] The fact that the Gilbert law firm now seeks a larger amount for Dr. Nelson's work is an implicit acknowledgment as to the excessive nature of the request in the Fee Claim. This is also further proof that Matteis and Copley exercised billing judgment and discretion in the trademark fee petition, judgment that is noticeably absent from the Gilbert law firm's Fee Claim.

Based on the foregoing analysis, the Gilbert law firm is entitled to reasonable expenses of $292,557.67 for reimbursable costs other than experts, $45,660 in expert fees for the services of technical expert Raymond Evans, and $382,404.00 in expert fees for the services of damages expert Phil Nelson, yielding a total costs award of $720,621.67.

## VI.

Based on careful consideration of the Fee Claim and supporting material, the parties' briefs and arguments, and the court's extensive experience in these types of cases, a fee award, measured by *quantum meruit*, of $1,237,720 is appropriate, and costs in the amount of $720,621.67 is appropriate, for a total of $1,958,341.67 as the fair and reasonable value of the Gilbert law firm's lien.

An appropriate Order will issue.

Alexandria, Virginia
September 29, 2014

/s/ _____
T. S. Ellis, III
United States District Judge

---

[27] *See* Plaintiffs' Memorandum in Support of Their Motion for Reasonable Attorneys' Fees, Costs, and Expert Witness Fees at 14 (Doc. 264).